874 P.2d 520

**Lillian R. MITCHELL, Plaintiff–Counterdefendant–Appellant,**

**v.**

**ZILOG, INC., a California corporation, Defendant–Counterclaimant–Respondent.**

No. 20058.

Supreme Court of Idaho, Boise, September 1993 Term.

April 18, 1994.

Rehearing Denied June 21, 1994.

William H. Ball, Boise, for appellant.

Penland & Munther, Boise, for respondent. James C. Dale argued.

McDEVITT, Chief Justice.

## BACKGROUND AND PRIOR PROCEEDINGS

Zilog, Inc., is a California corporation which manufactures integrated circuits. In late 1988, Zilog hired Lillian Mitchell to work as a production technician in Zilog's manufacturing facility in Nampa, Idaho. Mitchell began working at Zilog on December 5, 1988.

Around the time that Mitchell was hired, she received an Employee Information Guide. This guide explained Zilog's procedures and policies regarding communications between employees and supervisors, sick leave, medical insurance, and other benefits. The first two pages of the guide stated that the guide did not constitute an employment contract between Zilog and its employees. A subsequent section of the guide stated that Zilog reserved the right to terminate its employees with or without cause. In her deposition, Mitchell testified that she read the guide and had the opportunity to ask questions about the policies contained therein, but that she did not do so.

On May 19, 1989, Mitchell made a "process error." She received a verbal warning, which was to remain in effect for 90 days.[1] On December 29, 1989, Mitchell reported a second process error. For this, she received a write-up that was not a warning, but was for "Information Only." On June 1, 1990, Mitchell received a written warning in response to a third error for which she denied responsibility. Along with the warning,

Mitchell was decertified, transferred to a different shift, and was entirely retrained. The warning remained in effect for six (6) months.[2]

In August 1990, Mitchell and other Zilog employees received a seven-page document from the Zilog Procedures Manual regarding employee discipline ("Discipline Policy"). The policy addressed the disciplinary procedures to be used by supervisors for employee absenteeism, damage of Zilog property, and other problems. Another policy apparently addressed the procedures that Zilog management personnel were to use when dealing with substandard employee performance.

In December 1990, Mitchell received a second written warning for another processing error. This warning contained the following language:

This is a written warning. This warning is in effect for six (6) months. Any further misprocesses or specification violations on your part may result in further disciplinary action, up to and including termination.

On December 18, 1990, Mitchell made another processing error. The write-up she received this time normally would be in effect for six months, but Mitchell's supervisor doubled this time period. The write-up contained the following language:

Because of this you are being placed on a final written warning. This warning will remain in effect for twelve (12) months. Any violation within this time will result in possible termination.

On January 9, 1991, Mitchell received a certain form documenting all absences and processing errors ("OP 130 form"). At the time that she received this form, Mitchell asked her supervisor, Mike Young, whether signing the OP 130 form meant that her employment would be terminated. He told her that it did not, but added, "Please, Lil, be careful. Don't make any more mistakes."

Mitchell did not make any more processing errors and was not absent after she received the OP 130 form, but on January 24, 1991,

---

1. Zilog supervisors issued both verbal and written warnings. The issuance of both was documented in writing.

2. The internal memo documenting this warning stated that the error cost Zilog over $150,000.

Mitchell was informed by Henry Lopez, a member of management for Zilog, that her production output was too low and that she was thereby suspended from employment. During her suspension, Zilog ran extra-long shifts to compensate for Mitchell's absence. Mitchell's employment was terminated on February 4, 1991, less than two weeks after being suspended.

Mitchell filed a complaint in district court on August 22, 1991, alleging that the various written documents and oral statements that were made to her by Zilog during her employment created an employment contract which included an implied covenant of good faith and fair dealing; that Zilog terminated her in direct contravention of its stated policies; and that Zilog's actions constituted a breach of contract.

Zilog filed a motion for summary judgment. The district court granted this motion, ruling that there were no oral statements in the record that could create an employment contract and that the Employee Information Guide stated that oral statements could not create an employment contract; that the disclaiming language in the guide negated any inference of an employment contract; that the discipline policy did not restrict Zilog in its disciplinary and termination procedures; and that the written warnings received by Mitchell did not limit the reasons for which she could be discharged.

Mitchell appeals. On appeals from the granting of summary judgment, this Court reviews the record that was before the court below, including the pleadings, depositions and admissions, and affidavits, if any, to determine de novo whether, after construing the facts in the light most favorable to the nonmoving party, there is a genuine issue as to any material fact and whether Zilog, as the moving party, is entitled to judgment as a matter of law. I.R.C.P. 56(c); *Tolmie Farms v. J.R. Simplot Co.*, 124 Idaho 607, 609, 862 P.2d 299, 301 (1993).

## ANALYSIS

**I. Is there a factual dispute as to whether an employment contract existed between Mitchell and Zilog as created by the guide, discipline policy, written warnings received, and an oral statement made by Mitchell's supervisor?**

■ It is settled law in Idaho that, unless an employee is hired pursuant to a contract which specifies the duration of the employment or limits the reasons for which an employee may be discharged, the employment is at the will of either party. Either party may terminate the relationship at any time for any reason without incurring liability. *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 624, 778 P.2d 744, 746 (1989) (citations omitted). Thus, in the absence of an agreement which limits either party's right to terminate the employment relationship, either party may terminate it at any time or for any reason. *Id.*, 116 Idaho at 624, 778 P.2d at 746. This rule reflects the judiciary's reluctance to bind employers and employees to an unsatisfactory and potentially costly situation, although we recognize that either party is likely to be damaged by an unforewarned termination of the employment relationship.

■ A limitation on the at-will relationship may be express or implied. A limitation will be implied when, from all the circumstances surrounding the relationship, a reasonable person could conclude that both parties intended that either party's right to terminate the relationship was limited by the implied in fact agreement. *Metcalf*, 116 Idaho at 624, 778 P.2d at 746 (citations omitted).[3]

■ In particular, the presumption of an at-will employment relationship can be rebutted when the parties intend that an employee handbook or manual will constitute an element of an employment contract. Whether a particular handbook does so may be a question of fact, unless the handbook "specifically negates any intention on the part of the employer to have it become a part of the

3. The only exception to the above rule is that an employer at-will may be liable for wrongful discharge when the motivation for the discharge contravenes public policy. *Watson v. Idaho Falls*

*Consol. Hospitals,* 111 Idaho 44, 47, 720 P.2d 632, 635 (1986). Mitchell does not allege that the termination of her employment contravened public policy.

employment contract." *Metcalf,* 116 Idaho at 625, 778 P.2d at 747. Our task, then, is to examine the guide, the discipline policy, and the various written and oral statements that were made to Mitchell to determine first, whether they specifically negate any intention of contract formation, and if not, is there a question of fact as to whether they were intended by the parties to express a term of the employment contract.

### (a) The Employee Information Guide

The guide which Mitchell received at or near the time she began to work at Zilog contained at least three provisions attempting to disclaim the existence of any employment contract between Zilog and its employees. The first provision, contained on the first page of the guide, stated the following:

> This guide is not to be construed as a contract between Zilog and its employees and does not in any way imply or create any rights, contractual or otherwise, on behalf of Zilog's employees. Zilog may, at its sole discretion, alter or amend this guide or portions thereof at any time.

On page two of the guide, a statement from Zilog's president contained the following language:

> We're very glad you've chosen to become a member of our innovative team ... It is our hope that this guide will provide you with some general information on Zilog policies and benefits. Additional information will be given to you by your supervisor and peers. Hopefully, through this process we will be able to achieve a better understanding of your expectations and those of the company.

> Neither this guide nor the aforementioned information provided by your supervisor or peers are to be construed as a contract between Zilog and its employees. These communications do not in any way imply or create any rights, contractual or otherwise, on behalf of Zilog's employees. Zilog may at its sole discretion alter or amend this guide or portions thereof at any time.

A subsequent section of the guide stated the following:

**EMPLOYMENT AT WILL**

> While in the normal course of events, Zilog intends to follow the practices set forth in these materials and other Zilog publications, certain situations may occur in which Zilog will not follow the procedures outlined. In such situations, Zilog has and shall continue to have the power to take appropriate action including, but not limited to:
> 1. Changing compensation and working conditions, and/or
> 2. Termination of employees with or without cause.

■ Mitchell argues that this latter provision rebuts the presumption of at-will employment, because the at-will relationship will only be sustained in "certain situations." Keeping in mind the presumption of no contract formation, we are not persuaded by Mitchell's reading of this provision. First, the section is entitled "Employment at Will." Secondly, this provision expresses Zilog's intention to normally follow certain procedures. It does not say that normally, an employee can only be terminated with cause. Zilog's discipline policy describes the various warning procedures that are to be used by a supervisor, and contains a provision identical to that quoted immediately above. The message is that Zilog retains the overall right to terminate an employee with or without cause, but has distributed various handbooks and manuals to alert its employees about the normal steps leading to such termination. *Cf. Watson v. Idaho Falls Consol. Hosp.,* 111 Idaho 44, 47, 720 P.2d 632, 635 (1986) (employment handbook contributed to employment contract).

■ Mitchell then argues that the provisions contained on the first two pages of the guide are not prominent or clear enough to disclaim the implied contract. Our cases have not required such a litmus test. In *Metcalf,* we stated unless a provision in an employee handbook specifically negates any intention on the part of the employer to create an employment contract, a court may conclude from a review of the handbook that whether the handbook was intended by the parties to impliedly express a term of the employment agreement is a question of fact. *Metcalf,* 116 Idaho at 625, 778 P.2d at 747.

Mitchell urges authorities from other jurisdictions that require disclaimers to be prominently displayed; we are unpersuaded by this argument.

The provisions on the first two pages of the guide comply with *Metcalf* because they specifically negate any intention to form an employment contract. We therefore affirm the granting of summary judgment on this issue.[4]

### (b) The Discipline Policy (See Exhibit A for pertinent portions of the policy.)

The district court ruled that the discipline policy, which was distributed to Zilog employees in August of 1990, did not limit Zilog in its reasons, methods, and procedures for terminating an employee. Mitchell argues that Paragraph 4.8 did limit Zilog, because it stated that termination without cause would occur only in certain situations. This Court has previously held that employer documents which limited the reasons for discharge of an employee, and which did not expressly or impliedly provide for discharge without cause, contributed to an employment contract. *Watson*, 111 Idaho at 47, 720 P.2d at 635.

■ In essence, purportedly under its discipline policy, Zilog reserved the right to ignore the initial disciplinary steps and terminate any employee at any time for any violation of reasonable conduct or for failing to conform with any company rule, including but not limited to conduct that is listed in Paragraph 3.0. Furthermore, like the "Employment at Will" provision in the guide, Paragraph 4.8 of the discipline policy stated that normally, certain procedures would be followed; it did not specify that normally, employees would be terminated only for cause. Paragraph 4.8 reserves Zilog's right to terminate an employee without cause, essentially whenever it elects to do so. Paragraph 4.8 thus distinguishes this case from *Watson*, 111 Idaho 44, 720 P.2d 632, and reflects the essence of at-will employment relationships.

### (c) Written and oral statements

■ Mitchell next argues that the written warnings which she received for her processing errors limited Zilog's ability to terminate her employment, since each warned her that only a further error would result in termination. This contention is without merit. First, the two provisions on the first two pages of the guide specifically negate any inference that statements of supervisors or peers may constitute a contract. Second, Mitchell was fired while she was within an earlier warning period. Third, the logic of her argument would mean that any time that Zilog issued a warning, it was precluded from termination. This directly contradicts the terms of Zilog's written discipline policy.

■ Finally, Mitchell asserts that the statement of Mike Young transformed the at-will nature of her employment to a contract. Again, this argument is disclaimed by the provisions in the guide. Young's statement was only that she would not be terminated because she signed the OP 130 form. He did not expressly or impliedly limit the reasons why she could be discharged.

We affirm the ruling of the district court that, as to the existence of an employment contract, no issue of fact existed.

### II. Is there a triable issue of fact as to whether Mitchell's employment was terminated in violation of an implied covenant of good faith and fair dealing?

Mitchell argues that various documents provided by Zilog to its employees were ambiguous and/or inconsistent with each other, and that Zilog's sick leave policy violated the implied covenant of good faith and fair dealing that was inherent in Mitchell's employment contract. In particular, Mitchell contends that Zilog granted each employee a given number of sick days per year, yet penalized employees who validly used their sick days by allotting points for those absences and then terminating employees based on the total number of points allotted. Because the district court ruled as a matter of law that no employment contract existed, the court apparently determined that Zilog did

---

4. Because we conclude that the employment guide did not constitute a contract, we do not address Mitchell's arguments about its unilateral nature.

not breach the implied covenant of good faith and fair dealing.

■ We have said that the doctrine of an implied covenant of good faith and fair dealing applies to all employment relationships. *See Sorensen v. Comm Tek, Inc.*, 118 Idaho 664, 799 P.2d 70 (1990) (although Sorenson's employment was at-will, Comm Tek may still have breached the implied covenant of good faith and fair dealing); *see also Ray v. Nampa School Dist. No. 131*, 120 Idaho 117, 814 P.2d 17 (1991) (although whether Ray, the employee, worked pursuant to an employment contract posed an issue of fact, he might have a colorable claim of breach of the implied covenant). The theory of this covenant may be applied in cases which were filed on or after August 8, 1989, the date upon which a plurality of this Court first adopted the implied covenant of good faith and fair dealing in *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 778 P.2d 744. *Sorensen*, 118 Idaho at 669, 799 P.2d at 75.

■ In this case, however, the allegations in Mitchell's pleadings and deposition do not set forth specific facts showing that there is a genuine issue for trial. *See Brown v. Mathews Mortuary, Inc.*, 118 Idaho 830, 833, 801 P.2d 37, 40 (1990). Mitchell merely alleges that she took absences and that part of the reason for her termination from Zilog might have been attendance and tardiness. She does not allege or prove that these absences were sick days or that she was terminated for taking sick days. Rather, the record indicates that Mitchell's absences are either unexplained or attributable to vacation days, and that the more substantial reasons for Mitchell's termination were unsatisfactory job performance and production. Furthermore, Mitchell does not allege, and the record does not indicate, that other Zilog employees were penalized and/or terminated for taking sick days. Although Zilog employees were often allotted discipline points for absenteeism and tardiness, the discipline policy clearly distinguishes absences due to illness, from which we infer that sick days were not included in this policy. Finally, since the discipline policy warns employees that both absenteeism and substandard job performance provide cause for disciplinary action and/or immediate termination, we do not find that Mitchell's termination violated the implied covenant of good faith and fair dealing.

### III. Is there a triable issue of fact as to whether quasi-estoppel should have prevented Zilog from terminating the employment of Mitchell?

In her memorandum in opposition to Zilog's motion for summary judgment, Mitchell argued that Zilog should be estopped to terminate its employees for absences which are allowed by Zilog's sick leave policy, particularly since she alleges that the two reasons for her termination were her absences and her low production output. The trial court ruled that Zilog was not estopped to assert its right to fire Mitchell without cause at any time.

In August 1990, Zilog promulgated a policy wherein it informed its employees that points would accrue for absences taken by employees. These points were to be added to any points accrued by employees for their processing errors or other employment problems, and could result in disciplinary procedures, including termination. In Mitchell's deposition, she testified that she and the other employees discussed this new policy at length.

■ Mitchell asserts quasi-estoppel. The doctrine of quasi-estoppel has its basis in acceptance of benefits; it precludes a party from asserting to another's disadvantage a right inconsistent with a position previously taken by him or her. The doctrine applies where it would be unconscionable to allow a person to maintain a position inconsistent with one in which he acquiesced or of which he accepted a benefit. *KTVB, Inc. v. Boise City*, 94 Idaho 279, 281, 486 P.2d 992, 994 (1971). The act of the party against whom the estoppel is sought must have gained some advantage to himself or produced some disadvantage to another; or the person invoking the estoppel must have been induced to change his position. *Id.*, 94 Idaho at 281, 486 P.2d at 994 (citations omitted).

■ The very definition of quasi-estoppel demonstrates its inapplicability to this case. Zilog's position now is precisely the same as that which it held while Mitchell worked at

Zilog. Mitchell cannot viably argue that she knew nothing of the new policy, since Zilog notified its employees over five months before Mitchell was terminated that absences were a cause for penalty points. We therefore affirm the trial court.

### IV. Is Zilog entitled to attorney fees on appeal?

█ Attorney fees are awarded when this Court determines, from the record as a whole, that the case was brought frivolously or unreasonably. Where the losing party raises genuine issues of law and brings the appeal in good faith, attorney fees are not available under I.C. § 12–121. Mitchell's appeal raises a genuine issue of law. We therefore decline Zilog's request for attorney fees.

### CONCLUSION

We affirm the granting of summary judgment on the issues of the existence of the employment contract, an implied covenant of good faith and fair dealing, and quasi-estoppel. No attorney fees. Costs to respondent.

JOHNSON, TROUT and SILAK, JJ., concur.

BISTLINE, J., abstains.

### EXHIBIT A

Excerpts from Zilog's Discipline Policy

### 3.0 RATIONALE

It is the responsibility of managers and supervisors to administer a fair disciplinary program.

Discipline of an employee should be administered with the following philosophy in mind: Penalties or discipline should be in accordance with the degree of seriousness of the infraction.

Disciplinary action may be required in cases involving:

- Absenteeism
- Willful violation of company policy and/or procedures (*)
- Insubordination (*)
- Theft, of any kind (*)
- Conflict of interest
- Substance abuse (*)
- Endangering self and/or other employees (*)
- Damaging property of Zilog or Zilog employees (*)
- Falsification of company records and/or documents (*)

The following sequence will normally be observed and documented in all disciplinary action cases. Copies of any documentation must be given to Human Resources to be placed in the employee's personnel file.

The company reserves the right in cases of flagrant violation of company rules including but not limited to those above marked with an asterisk (*), to accelerate the disciplinary process, to and including immediate termination. Acceleration of the disciplinary process can occur at any time when the company, through its managerial representatives, determines it is necessary.

This policy does not generally apply in cases where the employee problem is substandard performance. Those cases are handled in the manner described in PMS 60–27 and 60–28.

. . . .

### 4.4 Termination

Document all circumstances leading up to termination. The Director or Manager of Human Resources, or his/her designee, must preapprove all actions prior to the notification of the employee, and be present at all terminations.

4.4.1 In cases involving a flagrant violation of reasonable conduct, the employee may be discharged immediately. If there are extenuating circumstances surrounding the violation, or the supervisor feels some action should be taken but more investigation is needed, the employee may be suspended with or without pay, pending further review of the violation.

4.4.2 An employee employed by the company for less than ninety (90) days will not require the disciplinary procedure outlined above. He/she may be terminated during the ninety day period after one written warning apprising

the employee of his/her performance or other problems. In the case of flagrant problems, the employee may be terminated without prior warning.

4.4.3 Employees who have been longer term employees may, depending on the circumstances and at the discretion of the applicable director they report to, have two or more written warnings prior to termination.

4.5 The steps outlined in 4.1 through 4.4 need not be followed in order. Any stage of discipline may be imposed as necessary. The company will attempt to assist those who make a good faith effort to improve, but will quickly increase the severity of discipline of those who are unwilling to work on solving their problems in a timely manner.

. . . .

4.8 While in the normal course of events the company intends to follow the practices established herein, certain situations may present themselves in which the company may not follow the procedures outlined. In such situations, the company has and shall continue to have the power to change wages or working conditions, and to terminate anyone with or without cause.