923 P.2d 493

**Pamala S. PARKER, Plaintiff–Appellant,**

v.

**BOISE TELCO FEDERAL CREDIT UN-ION, and Robert Burns, in his individual and agency capacity, Defendants–Respondents.**

**No. 21917.**

Court of Appeals of Idaho.

July 1, 1996.

Rehearing Denied Aug. 5, 1996.

Petition for Review Denied Oct. 4, 1996.

Lojek & Strother Chartered, Boise, for appellant. Donald W. Lojek argued.

Hall, Farley, Oberrecht & Blanton, Boise, for respondents. Candy W. Dale argued.

WALTERS, Chief Judge.

Pamela S. Parker was terminated from her employment with Boise Telco Federal Credit Union (BTFCU) in 1994. She filed a wrongful termination action against BTFCU and her former supervisor, Robert Burns, claiming: (1) breach of the employment contract; (2) breach of the implied covenant of good faith and fair dealing; (3) gender discrimination; and (4) that the doctrine of quasi-estoppel precluded termination of her employment. The district court granted summary judgment to the defendants on all four claims. Parker appeals, challenging the court's judgment on all of her claims except the one asserting gender discrimination. For the reasons stated, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Pamela Parker was employed by BTFCU from September 1991 through mid-January 1994, as BTFCU's head bookkeeper and as a computer operator. On January 18, 1994, she was terminated.

Parker had a share-draft checking account at BTFCU. In January of 1994, a federal audit showed that her account had negative balances overnight on January 5 and 6. Upon further investigation, it was learned that the account also had negative balances at the end of the day on July 8, October 8, November 9, 18 and 19, and December 22 of 1993. The investigation also disclosed that Parker was advised by either her supervisor or another employee when her account resulted in an overdraft and, once informed, she generally corrected the problem before the end of the

day on which the negative balance occurred. On the occasions noted above, however, Parker failed to eliminate the overdrafts until the next business day.

Through January 14, 1994, Parker's supervisor was Robert Card, president of BTFCU. On January 15, Card was replaced by Robert Burns, who had formerly been a BTFCU vice president. It was Burns who received the report of the federal audit, investigated the activity in Parker's account and later terminated her.

Parker's claim of wrongful termination focused on the application of two policy manuals governing the credit union's employer-employee relationships. One was the original policy manual given to Parker when she was hired in 1991 ("original manual"), and the other was a revised 1993 version ("revised manual"). The original manual provided a noninclusive enumeration of causes for progressive disciplinary action. The manual specifically stated that the list of causes "is ... meant to be a guide and shall not be deemed to exclude the credit union's right to discipline or discharge employees for any other cause." The original manual did not explicitly address whether the status of BTFCU's employees was at-will. The revised manual also contained a noninclusive enumeration of causes for progressive discipline, with the same disclaimer as in the original manual. The revised manual, however, stated that all employment was at-will and that employees could be discharged either with or without notice and either with or without cause. After receipt of the revised manual, Parker signed an Acknowledgment Sheet on February 4, 1993, which stated that:

> The contents contained in this handbook are presented as a matter of information only and are not to be construed as a contract between the employer and its employees. The [Boise Telco Federal Credit Union] reserves the right to unilaterally and without notice add to, change or delete, supplement, or rescind all or any part of the practices, procedures, or benefits described in the handbook as it deems circumstances require. I agree to conform to the rules and regulations of the Credit

Union. I also understand that my employment and compensation can be terminated, with or without cause, and with or without notice at any time, at the option of either the Credit Union or myself.

The application of the two policy manuals was asserted in differing respects by the parties when each side moved for summary judgment in Parker's wrongful termination action. After a hearing, the district court granted summary judgment to the defendants on the contract and covenant issues, denying summary judgment to either party on the gender discrimination issue, and holding that estoppel was inapplicable. BTFCU moved for reconsideration of the gender discrimination issue. Upon reconsideration, the court granted summary judgment on that issue to the defendants. Then, Parker filed a motion to reconsider the breach of employment contract and covenant issues or, in the alternative, for an entry of a final judgment pursuant to I.R.C.P. 54(b). The district court entered a final judgment denying Parker's motion and Parker filed this appeal.

## II. ISSUES

Parker raises three issues: (1) whether an employment contract existed that limited the employer's right to terminate Parker at will and, if so, was it either modified or breached by BTFCU; (2) assuming Parker was an employee at-will, whether BTFCU breached the implied covenant of good faith and fair dealing; and (3) whether triable issues of fact existed under the doctrine of quasi-estoppel.

## III. STANDARD OF REVIEW

Our Supreme Court provided the following standard for review of summary judgments in *Featherston v. Allstate Insurance Co.*, 125 Idaho 840, 875 P.2d 937 (1994):

When faced with an appeal from a summary judgment, this Court employs the standard of review properly applied by the trial court when originally ruling on the motion. In order to determine whether judgment should be entered as a matter of law, the trial court must review the pleadings, depositions, affidavits, and admissions on file. On review, as when the judgment is initially considered by the trial court, this Court liberally construes the record in the light most favorable to the party opposing the motion, drawing all reasonable inferences and conclusions in that party's favor. If reasonable people could reach different conclusions or draw conflicting inferences from the evidence, the motion must be denied. However, if the evidence reveals no disputed issues of material fact, the trial court should grant summary judgment.

*Id.* at 842, 875 P.2d at 939 (citations and quotation marks omitted).

## IV. DISCUSSION

### A. Employment Contract.

#### 1. Did A Contract Exist For Employment Other Than Employment At Will?

Parker first claims that she had an employment contract with BTFCU that limited the right of BTFCU to discharge her. She argues that the original manual, not the subsequent revision of the manual, constituted part of this contract. Parker also contends that because the original manual was part of her employment contract, this was the manual she relied upon during her tenure.

BTFCU argues two positions. On one hand, BTFCU contends that Parker was not employed pursuant to an employment contract. Alternatively, BTFCU argues that if a contract did exist, it was negated by the employee-at-will provisions in the revised manual and the disclaimers found on the noted Acknowledgment Sheet which Parker signed upon receipt of the revised manual.

There is no evidence of any express employment contract in the record. It appears that Parker did not sign a contract when she began employment with BTFCU, nor did she do so any time thereafter. However, the lack of a written, express employment agreement does not mean that there was not a contract. Clearly, BTFCU offered Parker a job in September of 1991 and she accepted the offer by coming to work. Thereafter BTFCU compensated Parker with salary and benefits while it received the

benefit of her labor. Therefore, we conclude that an employment contract existed between the parties, contrary to BTFCU's first argument.

## 2. Was the Employment Contract Breached?

■ It is settled that, unless an employee is hired pursuant to a contract which specifies the duration of the employment or limits the reasons for which an employee may be discharged, the employment is at the will of either party. *Mitchell v. Zilog, Inc.*, 125 Idaho 709, 712, 874 P.2d 520, 523 (1994); *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 624, 778 P.2d 744, 746 (1989). Thus, in the absence of an agreement which denotes either party's right to terminate the employment relationship, either party may terminate it at any time or for any reason without incurring liability. *Mitchell, supra; Metcalf, supra.*

■ A limitation on the at-will relationship may be express or implied. *Mitchell, supra; Metcalf, supra.* A limitation will be implied when, from all the circumstances surrounding the relationship, a reasonable person could conclude that both parties intended that either party's right to terminate the relationship was limited by the implied-in-fact agreement. *Mitchell, supra; Metcalf, supra.* Furthermore, the presumption of an at-will employment relationship can be rebutted when the parties intend that an employee handbook or manual altering that relationship will constitute an element of an employment contract. *Mitchell, supra; Metcalf, supra.* Whether a particular handbook does so may be a question of fact, unless the handbook "specifically negates any intention on the part of the employer to have it become a part of the employment contract." *Mitchell,* 125 Idaho at 712–13, 874 P.2d at 523–24; *Metcalf,* 116 Idaho at 625, 778 P.2d at 747.

Inasmuch as Parker was not hired pursuant to a contract which specified the duration of employment or limited the reasons for discharge, the terms of the employment contract must be determined by looking to the terms implied in fact by the circumstances of this case and those implied by law. The implied-in-fact terms claimed by Parker are few in number. Parker argues that: (1) she relied solely upon the original manual during her tenure at BTFCU; (2) Burns testified in a related proceeding conducted by the state department of employment to determine Parker's eligibility for unemployment compensation benefits that he had discharged Parker for unsatisfactory work performance; and (3) the original manual mandated that BTFCU institute the progressive disciplinary policy for unsatisfactory work performance, which would have provided Parker with notice of her alleged poor job performance and an opportunity to correct it prior to termination.

BTFCU counters with the revised manual which it alleges was in effect at the time Parker was terminated. This manual contains the following disclaimer under the heading, "At–Will Employment":

> All employment at Boise Telco Federal Credit Union is "at-will." This means that both employees and the credit union have the right to terminate employment at any time, with or without advance notice, and with or without cause....

The revised manual also contains a provision entitled "Termination by Employer," which states that "staff members are considered to be 'at-will' employees." Finally, the record shows that upon receipt of the revised manual, Parker signed the noted Acknowledgment Sheet which provided the disclaimers mentioned above.

However, Parker argues that modification of the original manual through issuance of the revised manual was made unilaterally by BTFCU without her consent, and that the changes were not supported by any consideration. Parker also contends that it was neither her intent to accept BTFCU's modifications by continuing to work after receipt of the revised manual, nor was it her intent to have her signature on the Acknowledgment Sheet be used to allow the disclaimers to change her employment status. Parker asserts that her signature on the Acknowledgment Sheet only represents that she acknowledged "the power of the employer to terminate her employment." She also contends that "[n]owhere has ... [she] conceded

the legal right to be terminated outside the terms of the contract formed in 1991. . . ."

BTFCU claims that it could unilaterally modify the prior employee manual. It asserts that, as a consequence, the revised manual, not the original manual, was in effect when Parker was discharged. BTFCU further argues that because both the revised manual and the Acknowledgment Sheet specifically negated any intention to form an employment contract, Parker cannot maintain an action for breach of contract.

Parker urges this Court to adopt a rule which precludes employers from modifying their manuals or handbooks without the consent of each existing employee. Although the Idaho appellate courts have not directly addressed this issue, our Supreme Court's opinion in *Watson v. Idaho Falls Consolidated Hospitals, Inc.*, 111 Idaho 44, 720 P.2d 632 (1986), is instructive.

In *Watson*, Bernetta Watson was hired as a nurse's aide by Idaho Falls Consolidated Hospitals (the "hospital") in 1975. She was given an employee handbook when she was hired but no written employment contract was executed. During her employment she became eligible for medical, life and long-term disability insurance, sick leave, vacation and retirement benefits. She received yearly pay increases and her job performance resulted in average and above-average evaluations. In mid–1983, the hospital held an employees' meeting at which time a revised edition of the handbook was delivered to all employees, including Watson. The employees were required to sign an acknowledgment of receipt of the revised handbook which explained hospital policy, discipline, counseling and termination. In the revised manual, ten categories of misconduct were listed which would result in immediate dismissal, including intentional falsification of business records. Later that year, Watson was terminated for allegedly falsifying her employment time records.

Watson filed an action against the hospital and her supervisor claiming wrongful discharge, that her termination was accomplished without taking steps to rehabilitate or salvage her employment, that her supervisor had intentionally interfered with her employment relationship with the hospital, that both defendants had intentionally inflicted emotional distress upon her, and that the accusations prior to discharge constituted slander. The claims alleging slander and interference with contractual relations were dismissed upon the defendants' motion for summary judgment. The jury found for the defendants on the emotional distress claim and in favor of Watson on the claim of breach of contract resulting in a wrongful discharge, and awarded her monetary damages. The hospital moved for judgment notwithstanding the verdict, and requested, in the alternative, that Watson's damages be reduced to the actual pretrial pecuniary losses. These motions were denied. The hospital appealed from the judgment entered in favor of Watson and from the court's denial of its motion for judgment notwithstanding the verdict.

On appeal, the hospital argued that a contract of employment did not exist between Watson and the hospital which prohibited the hospital from terminating Watson's at-will employment. The hospital asserted that basic contract law required a meeting of minds, a distinct understanding common to both parties, a mutual intent and the creation of a mutuality of obligation. The hospital also argued that the employee handbooks in that case could not constitute a contract because there was no mutuality of obligation. Our Supreme Court, however, decided that a contract of the type represented by the handbooks in *Watson* constituted a unilateral contract, not a bilateral contract. The Court held that traditional contract analysis is inadequate to deal with the realities of the workplace, and that the unilateral contract analysis is correct. The Court adopted the following rationale:

Thus analyzed, the manual is an offer that seeks the formation of a unilateral contract—the employees' bargained-for action needed to make the offer binding being their continued work when they have no obligation to continue.

The unilateral contract analysis is perfectly adequate for that employee who was aware of the manual and who continued to work intending that continuation to be the action in exchange for the employer's

promise; it is even more helpful in support of that conclusion if, but for the employer's policy manual, the employee would have quit.

111 Idaho at 48, 720 P.2d at 636 (citations and quotation marks omitted).

■■■ BTFCU contends that Parker's suggestion to this Court to adopt a rule which precludes employers from modifying their employee policy manuals or handbooks without the consent of their employees, is overburdensome to employers. It argues that a better approach is the one followed by the Michigan Supreme Court in *In Re Certified Question (Bankey v. Storer Broadcasting Co.)*, 432 Mich. 438, 443 N.W.2d 112 (Mich. 1989). In *Bankey*, an employee brought suit in federal court against his former employer for breach of an employment contract. Under an employee manual, issued by the employer in 1980, employees could be discharged only for cause. However, the employer revised the manual in 1981, eliminating the "for cause" requirement and inserting an employment at-will provision. The Michigan Supreme Court, answering a certified question from the United States Court of Appeals for the Sixth Circuit, held that an employer, without express reservation of the right to do so, can unilaterally change its written policy from one of discharge for cause to one of termination at will.[1] The Michigan Supreme Court further held that for the modification "to become legally effective, reasonable notice of the change must be uniformly given to affected employees," and reasoned that such notice promoted fairness through uniform treatment of employees in the workplace. The Michigan Court also stated that to require an employer to negotiate policy changes with each existing employee would defeat

the purposes for employment policies generally. We agree.

Parker acknowledges in her affidavit that: (1) the original manual was unilaterally modified; (2) the revised manual is a correct copy of the manual distributed by BTFCU approximately one year before she was discharged; (3) she signed the noted Acknowledgment Sheet on February 4, 1993, after receipt of the revised manual; and (4) the Acknowledgment Sheet stated that the revised manual was not a contract, that BTFCU reserved the right to unilaterally alter the manual, and that employment could be terminated at any time with or without notice or cause. These facts clearly show that Parker received reasonable notice of the modifications prior to being discharged consistent with *Bankey*.

■■■ We therefore conclude that BTFCU could unilaterally modify the employee manual changing the status of its employees to one at-will. We also hold that both the revised manual and the Acknowledgment Sheet provided Parker with reasonable notice of BTFCU's changes to the original manual. Consequently, the revised manual was in effect on the date of Parker's termination, and BTFCU did not breach any existing employment contract with Parker.

### 3. Progressive Disciplinary Policy.

Parker next argues that she had a contractual right to the progressive disciplinary procedure set forth in the employee manuals. The revised manual states that if "unsatisfactory work performance" by an employee appears to be a problem, an attempt shall be made to correct the situation before disciplinary action is taken. Parker argues that because Burns reported that he terminated her for unsatisfactory work performance, she was

---

1. The following is the certified question which the Michigan Supreme Court agreed to answer, in full:

Once a provision that an employee shall not be discharged except for cause becomes legally enforceable under *Toussaint v. Blue Cross & Blue Shield of Michigan*, 408 Mich[.] 578 [579]; [292 N.W.2d 880] (1980), as a result of an employee's legitimate expectations grounded in the employer's written policy statements, may the employer thereafter unilaterally change those written policy statements by adopting a generally applicable policy and alter the employment relationship of existing employees to one at the will of the employer in the absence of an express notification to the employees from the outset that the employer reserves the right to make such a change? *Bankey*, 443 N.W.2d at 113 (quotation marks omitted).

entitled to written warnings, which she did not receive, prior to being terminated.[2]

In response, BTFCU claims that Parker did not have a contractual right to the progressive discipline policy prior to being discharged because she was an employee at-will. Alternatively, BTFCU argues that if Parker did have a contractual right to the discipline policy, her discharge was not due to unsatisfactory work performance but, rather, because of a lack of trust brought about by her misrepresentations to BTFCU personnel regarding the handling of her personal checking account. BTFCU asserts that after Parker was informed of her overdrafts, she consistently provided assurances that the negative balances would be corrected by the end of each business day, and then failed to do so on the noted occasions. BTFCU further argues that given Parker's degree of responsibility, it was important that Parker maintain a high level of integrity and trustworthiness.

The issue of whether an at-will employee has a contractual right to warnings pursuant to a progressive discipline policy in an employee manual, prior to being terminated, is one of first impression in this state. Several courts addressing this issue have held that employers can specifically communicate, in a conspicuous manner, that nothing contained in an employment manual is intended to be part of the employment contract. *See, e.g., Swanson v. Liquid Air Corp.,* 118 Wash.2d 512, 826 P.2d 664, 671–72 (1992). It is generally recognized that an employer can disclaim what might otherwise appear to be enforceable promises in handbooks or manuals or similar documents. *Id.* 826 P.2d at 672. At a minimum, the disclaimer at issue must state in a conspicuous manner that nothing contained in the handbook, manual, or similar document is intended to be part of the employment contract and that such statements are instead simply general statements of company policy. *Id.; see also Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081, 1088 (1984). In order to be effective, the disclaimer must be communicated to the employee, so that it gives the affected employee reasonable notice that the employer is disclaiming intent to be bound by what otherwise appears to be promises of employment conditions. *Swanson,* 826 P.2d at 673; *see also, Payne v. Sunnyside Community Hospital,* 78 Wash.App. 34, 894 P.2d 1379 (1995) (disclaimers in employment manual provided effective notice to employee that employer did not intend to modify at-will status through progressive discipline policy set forth in manual). However, an employer's inconsistent representations and conduct may negate or override a disclaimer purporting to affect the employment relationship. *Id.* at 674–75.

■ Because we hold that the revised manual was in effect on the day Parker was terminated, we must determine whether the disclaimer stated in a conspicuous manner that nothing contained in the manual was intended to be part of the employment relationship and that such statements were instead simply general statements of company policy. The record shows that the disclaimers provided on the Acknowledgment Sheet stated that the contents of the revised manual were presented as a matter of information only and were not to be construed as a contract; that BTFCU reserved the right to unilaterally and without notice modify the manual; and that employees could be terminated either with or without notice and cause. Furthermore, it is undisputed that Parker signed the Acknowledgment Sheet upon receipt of the revised manual. In light of these facts, we conclude that the disclaimers provided by the Acknowledgment Sheet stated in a conspicuous manner that nothing contained in an employment manual was intended to be part of the employment contract. Furthermore, since the disclaimers were given to Parker upon receipt of the revised manual, which was approximately one year before she was terminated, Parker had reasonable notice of them. We therefore conclude that Parker did not have a contractual right to the progressive disciplinary procedures in the revised manual.

2. In her brief, Parker also argues that BTFCU breached the contract because it knew of her "occasional overdrafts ... [and] condoned them." This argument is addressed in this opinion under Parker's claim that BTFCU breached the covenant of good faith and fair dealing.

Accordingly, we uphold the district court's determination that there was no genuine issue of material fact with regard to whether Parker received reasonable notice of the changes in the employee manual and, consequently, whether BTFCU breached its employment contract with her.

### B. Implied Covenant of Good Faith and Fair Dealing.

Next, Parker claims that if she was an employee at-will, the district court erred in granting summary judgment to BTFCU on the issue of whether the implied covenant of good faith and fair dealing was breached. Parker argues that the covenant provided her with the right to receive the "benefits" of the employment contract between her and BTFCU. The benefits to which she refers appear to be continued employment and written warnings pursuant to the progressive discipline policy set forth in the employee manuals.

BTFCU asserts that the implied covenant of good faith and fair dealing does not preclude a termination without cause of an at-will employee. It argues that in *Metcalf,* our Supreme Court explained that the covenant only protects an employee from a "discharge based on an employer's desire to avoid the payment of benefits already earned by the employee." 116 Idaho at 627, 778 P.2d at 749.

 The implied-in-law covenant of good faith and fair dealing protects the right of the parties to an agreement to receive the benefits of the agreement that they have entered into. *Metcalf,* 116 Idaho at 627, 778 P.2d at 749. The denial of a party's right to those benefits, whatever they are, will breach the duty of good faith implicit in the contract. *Id.* The covenant does not protect the employee from a "no cause" termination because tenure was never a benefit inherent in the at-will agreement. *Id.* A breach of this covenant occurs when a party takes any action which "violates, nullifies, or significantly impairs" the rights or benefits due under the existing contract. *Id.; Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.,* 121 Idaho 266, 289, 824 P.2d 841, 864 (1991). This doctrine applies to all employment relation-

ships. *Mitchell,* 125 Idaho at 712, 874 P.2d at 523.

As noted, we hold that Parker originally had an employment contract with BTFCU which was subsequently modified by changing her employment status to one at-will. Because the disclaimers in the revised manual and the Acknowledgment Sheet conspicuously provided that the contents of the handbook were not to be construed as a contract between BTFCU and its employees, Parker did not have a contractual right to the progressive discipline policy. Furthermore, we hold that Parker was not entitled to continued employment because such employment is not a benefit of an at-will employment relationship.

We therefore uphold the district court's conclusion that no material issue of fact existed with regard to Parker's claim for breach of the covenant of good faith and fair dealing.

### C. Doctrine of Quasi–Estoppel.

Finally, Parker claims that the district court erred in granting BTFCU summary judgment on the issue of quasi-estoppel. She asserts that when overdrafts of other employees occurred, including those of her former supervisor, Robert Card, the employees did not experience negative repercussions from BTFCU management. She argues that BTFCU suddenly changed its position on the unwritten policy of not reprimanding employees for such activities when Burns replaced Card in 1994. Parker also contends that she was first made aware that overdrafts could put an employee's job in jeopardy on the day she was terminated for such activity.

 In *Mitchell,* our Supreme Court has provided the following summary of the doctrine of quasi-estoppel:

The doctrine of quasi-estoppel has its basis in acceptance of benefits; it precludes a party from asserting to another's disadvantage a right inconsistent with a position previously taken by him or her. The doctrine applies where it would be unconscionable to allow a person to maintain a position inconsistent with one in which he

acquiesced or of which he accepted a benefit. The ... party against whom ... estoppel is sought must have gained some advantage to himself or produced some disadvantage to another; or the person invoking the [doctrine of] estoppel must have been induced to change his position. 125 Idaho 709, 715, 874 P.2d 520, 526 (citations omitted). *See also Young v. Idaho Dept. of Law Enforcement,* 123 Idaho 870, 875, 853 P.2d 615, 620 (Ct.App.1993).

Parker submits that BTFCU should have been estopped from terminating her employment because BTFCU allegedly condoned employees's past practices with regard to overnight negative account balances. In order for Parker to prevail on this claim, she must first show that BTFCU maintained a position inconsistent with one which it had previously taken.

 It is undisputed that BTFCU had an unwritten policy prohibiting its employees from maintaining negative account balances overnight so that an employee would not be using funds of BTFCU's members to cover the employee's overdrafts. Parker argues that BTFCU has condoned such prohibited activities on several occasions. She first argues that her former supervisor, Card, experienced overdrafts without any repercussions from management. However, according to an affidavit prepared by Robert Burns, Card's situation did not involve a negative account balance. Rather, Card obtained a loan from BTFCU and experienced late loan payments. Burns stated that Card was charged all the finance and other fees and penalties as any other member of BTFCU would have been charged under similar circumstances. Second, Parker argues that Card chose to overlook one of her overdrafts, and by doing so, condoned her practice. We disagree. Although the record shows that Card did overlook one of Parker's negative account balances, we are unpersuaded that this incident reasonably could have led Parker to believe that she would not be fired for continuously overdrawing her account. That one incident is insufficient to support a claim of estoppel.

We therefore uphold the district court's conclusion that no genuine issue of material fact existed with regard to the applicability of the doctrine of quasi-estoppel.

## V. CONCLUSION

We affirm the district court's ruling that no material issue of fact existed with regard to whether: (1) an employment contract existed between Parker and BTFCU that restricted the right to terminate at will; (2) BTFCU breached the implied covenant of good faith and fair dealing; and (3) the doctrine of quasi-estoppel applies.

Accordingly, BTFCU was entitled to summary judgment as a matter of law. The district court's order granting BTFCU's motion for summary judgment is affirmed. Costs, but not attorney fees are awarded to respondents.

LANSING and PERRY, JJ., concur.