William R. WYMAN

v.

The OSTEOPATHIC HOSPITAL OF MAINE, INC.

Supreme Judicial Court of Maine.

Argued Jan. 23, 1985.

Decided May 29, 1985.

Edward F. Bradley, Jr., (orally), Portland, for plaintiff.

Bernstein, Shur, Sawyer & Nelson, Peter J. Rubin, (orally), Joyce A. Wheeler, Portland, for defendant.

Before McKUSICK, C.J., and ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

VIOLETTE, Justice.

The plaintiff brought this action in the Superior Court, Cumberland County, alleging that the defendant wrongfully discharged him from his employment. After the presentation of the plaintiff's case in a jury-waived trial, the presiding justice granted judgment for the defendant. The plaintiff filed a timely appeal from the judgment. We affirm the judgment entered in the Superior Court.

I.

The plaintiff, William Wyman, began working for the defendant, the Osteopathic Hospital of Maine, Inc. ("OHM"), in 1967. After a series of promotions and raises, Wyman became the head chef at OHM in 1981. As head chef Wyman was responsible for all food preparation at OHM. Wyman served as head chef until OHM discharged him on June 18, 1982.

There was no formal written employment agreement between Wyman and OHM. In June of 1982, however, there was in effect at OHM an "employee handbook."[1] In an introductory statement this handbook provides, "This employee handbook outlines the hospital policies and is considered a

---

1. This particular book became effective in March of 1982. At trial, Wyman introduced into evidence three other OHM employee handbooks that cover the period from January of 1974 through February of 1982.

portion of the terms and conditions of employment as well as your benefits." The introductory statement is subscribed by the "BOARD OF TRUSTEES." The contents of the handbook cover a variety of topics regarding employment at OHM and include discussion of a pension plan, a probationary employment period, a reprimand procedure, and a termination procedure. OHM required Wyman to sign an "EMPLOYEE ACKNOWLEDGEMENT" noting the employee's responsibility to read the handbook and stating that the handbook "constitutes the general personnel policies of the Hospital."

Also in effect at OHM in June of 1982 was "THE RETIREMENT PLAN FOR EMPLOYEES OF [OHM]." [2] This plan provides that normal retirement age at OHM is sixty-five years of age. The plan expressly states, "Neither the establishment of the Plan, nor the Trust Fund, nor any modification thereof, nor the payments of any benefits hereunder shall be construed as giving any employee the right to be retained in the service of the employer or as interfering with the right of the employer to discharge any employee at any time."

At trial, Wyman testified that, during the course of his employment at OHM, he approached several of his superiors concerning job security. According to Wyman, Chris Olsen, executive director at OHM, told him during "the latter stages of his employment" that "if [he] did a good job ... and didn't do anything wrong, [he would] be able to retire from the hospital." Further, that Wyman testified, about "a month and a half before [he] was terminated" Neil Basset, the assistant administrator at OHM, informed him that "as long as [he] followed the rules and [didn't] do anything wrong ... [Basset couldn't] see why

[he] couldn't retire from [OHM]." Finally, Wyman testified that Ray Colbath, the food services director at OHM and the plaintiff's immediate supervisor,[3] indicated to him on several occasions that if he followed the provisions of the employee handbook his job would be secure until he retired. Colbath also testified at trial, and acknowledged telling Wyman that if he complied with the provisions of the employee handbook, "then he could expect to be reasonably assured of his job."

OHM discharged Wyman on the basis of an incident that occurred on Wednesday, June 16, 1982. On the preceding Saturday, Wyman had instructed a cook to either freeze or use certain leftover, uncooked chicken, and to order fresh chicken for use on Wednesday, June 16. The next day that Wyman worked was Wednesday, June 16. When he arrived at 9:00 a.m. on Wednesday, certain chicken was ready to be cooked for the noon meal. A cook informed Wyman that he had washed this chicken in baking soda before preparing it for the oven because it had a "funny odor." Wyman, finding a delivery slip for fresh chicken on his desk, assumed that the chicken prepared for the noon meal was the recently delivered, fresh chicken and took no action at that point. At 11 a.m., after this chicken was cooked, Wyman tested it by tasting it. Because the chicken tasted fine, Wyman served it to the patients for lunch.

At 5 p.m. that evening, Betty Wilson, the food services director, came to the kitchen and asked Wyman if anything was wrong with the food served for lunch. The cause of Wilson's concern was the fact that two patients had complained of nausea after eating the lunch served by Wyman. Wyman responded in the negative, and Wilson left the kitchen. Five minutes later, Wil-

---

**2.** The retirement plan is explained in nontechnical terms in a booklet that was generally available to OHM employees from 1976 through June 18, 1982. At page 2, the booklet states, "A copy of the legal document is on file with the Personnel Department and may be reviewed by you at any time during regular office hours."

**3.** Colbath was no longer employed at OHM when the hospital terminated Wyman's employment. Betty Wilson was the food services director at that time.

son returned and specifically asked whether there was anything wrong with the chicken served at noon. Wyman, Wilson, and Harry New, the cook on duty at the time, then tested some of the same chicken by tasting it. Both Wyman and New said the chicken tasted fine; Wilson said nothing.

The next day, both Wyman and Wilson discovered that the chicken served on Wednesday, June 16 was the chicken left over from the preceding Saturday, and not the fresh chicken delivered that week as Wyman had assumed. Wilson accused Wyman of knowingly serving old chicken and then lying to cover up that fact. Wilson then discharged Wyman on Friday, June 18. Wyman resorted to the OHM grievance procedure, which is outlined in the employee handbook, to contest his termination, but OHM upheld Wilson's decision.

Wyman then filed this action alleging that the termination of his employment at OHM breached an obligation owed to him by the hospital pursuant to its "policies, programs and statements." The Superior Court entered a judgment for the hospital.

## II.

■ We first examine the scope of review applicable to this appeal. At the close of the plaintiff's case during the jury-waived trial, the defendant moved for a "directed verdict." *See* M.R.Civ.P. 50(a). After hearing argument by counsel on this motion, the presiding justice granted a "directed verdict" in favor of the defendant. Arguably, therefore, in deciding this appeal, "we must view the evidence, 'including every justifiable inference,' in the light most favorable to the plaintiff so that we may decide whether by any reasonable view of this evidence a [judgment] for the plaintiff could be sustained." *Packard v. Central Maine Power,* 477 A.2d 264, 267 (Me.1984); *Boetsch v. Rockland Jaycees,* 288 A.2d 102, 104 (Me.1972).

As noted above, however, the trial in the Superior Court was without a jury.

> [I]n a nonjury case the judge is not bound to rule as he would in a jury case solely on the legal sufficiency of the evidence. He may ... decide the factual issues against the plaintiff.

1 Field, McKusick & Wroth, *Maine Civil Practice* § 41.7, at 579 (2d ed.1970); *see Department of Human Services v. Earle,* 481 A.2d 175, 179 (Me.1984). The proper motion for the defendant to make in this situation is a motion for judgment pursuant to M.R.Civ.P. 50(d).[4] *See* 1 Field, McKusick & Wroth, *supra,* at § 41.7, at 578 ("In ... nonjury cases the motion for directed verdict is of course not available.").

■ It is clear from the record that the presiding justice did resolve factual issues against the plaintiff in granting the defendant's motion for a "directed verdict."[5] We will therefore treat the defend-

---

4. Rule 50(d) provides:

**Motion for Judgment in Nonjury Case.** After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for judgment on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render any judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall upon request make findings as provided in Rule 52(a).

The motion for judgment pursuant to Rule 50(d) replaces the motion for involuntary dismissal pursuant to Rule 41(b)(2) that existed under prior practice. *See* Me.Rptr., 449–458 A.2d LIV–LV; *cf.* 1 Field, McKusick & Wroth, *supra,* at § 41.7.

5. Compare the situation in *Department of Human Services v. Earle,* where we observed:

Although the ... [j]udge was empowered "to weigh the evidence, resolve any conflict in it, and decide for itself where the preponderance lies," ... he did not act as factfinder in the present case. ... [T]he ... [j]udge ruled on the legal sufficiency of the evidence. This action was equivalent to the direction of a verdict in a jury case.

481 A.2d at 179 (citation omitted).

ant's motion as a motion for judgment under Rule 50(d). *See* 1 Field, McKusick & Wroth, *supra*, at § 41.7, at 578 ("Obviously, if the defendant mislabelled his motion as one for a directed verdict it would be treated as a motion for [judgment]."). Where the trial court properly decides the facts as well as the law, we are not bound to view the evidence in the light most favorable to the plaintiff. Rather, we must accept the facts found by the presiding justice unless those findings are clearly erroneous. *See Harmon v. Emerson*, 425 A.2d 978, 981–82 (Me.1981).

### III.

In rendering judgment in favor of the defendant, the presiding justice made certain findings. *See* M.R.Civ.P. 50(d), 52(a). The justice first found an employment contract between the parties based upon the employee handbook, the retirement plan, and the conversations the plaintiff had with several of his superiors at OHM concerning job security. Under this contract, the trial court determined, the defendant could not terminate the plaintiff's employment at will. The presiding justice also found that the plaintiff negligently performed his duties as head chef during the chicken incident on June 16, 1982. Although the justice determined, based upon the expert testimony presented at trial, that there was in fact no food poisoning from the chicken, he further found that the plaintiff failed to adequately investigate the freshness of the chicken after learning that it had a bad odor, and failed to adequately apprise his supervisors of the potential problem. The presiding justice considered this conduct in light of evidence of past problems with the plaintiff's sanitation practices at OHM.[6] According to the justice, this negligence provided reasonable cause for the defendant to discharge the plaintiff, and was a sufficient basis for the termination of the plaintiff's employment under the employ-

ment contract. The trial court therefore concluded that the plaintiff failed to carry his burden of demonstrating that the defendant wrongfully discharged him.

On appeal, the plaintiff contends that under the employee handbook, which the trial court found to be part of the employment contract between the parties, the chicken incident is an insufficient basis for the termination of his employment. According to the plaintiff, his conduct during this incident was reasonable rather than negligent. In any event, the plaintiff argues, the handbook provides that OHM can immediately discharge an employee such as himself only for "serious misconduct." The plaintiff observes that, although the trial court found that his conduct on June 16 was negligent, it did not find that it constituted "serious misconduct" as referred to in the handbook. The plaintiff concludes that his discharge was in violation of a contractual obligation owed to him by the defendant, and therefore wrongful.

Until recently, it was "well settled" in Maine "that a contract of employment for an indefinite length of time [was] terminable at will by either party." *Terrio v. Millinocket Community Hospital*, 379 A.2d 135, 137 (Me.1977). In *Larrabee v. Penobscot Frozen Foods*, however, we held that parties may agree to an employment of indefinite length that is terminable by the employer only pursuant to particular terms, such as for good cause. 486 A.2d 97, 99–100 (Me.1984). Such an agreement is binding "even though no consideration other than services to be performed or promised is expected by the employer, or is performed or promised by the employee." *Id.*

We assume without deciding that in the case at bar there was an agreement between the parties for an employment of

---

**6.** There was evidence of an incident within a month of Wyman's discharge where he failed to retrieve toast that was brought to patient's rooms after he discovered that the butter being used was spoiled. Also introduced at trial were recent written evaluations of the Wyman's job performance at OHM stating that his sanitation practices needed to be discussed.

indefinite length[7] terminable by the defendant only pursuant to the terms of the employee handbook. We nevertheless conclude that we must uphold the trial court's finding that the termination of the plaintiff's employment by the defendant was proper under this employment agreement.

First we determine that the employee handbook permits the defendant to discharge immediately an employee such as the plaintiff for any good cause, and not just for "serious misconduct." The section of the handbook entitled "TERMINATIONS" refers to discharges "for cause." Regarding such discharges, it provides that a three step reprimand procedure found elsewhere in the handbook "need not be followed as the termination will be immediate and the employee will not be eligible for reemployment." The "TERMINATIONS" section continues by stating, "Causes for immediate discharge *include* serious misconduct such as: ....," and it then lists various examples. (emphasis added). Such language clearly does not preclude an employer from immediately discharging an employee for any good cause.

Next, we conclude that we must uphold the trial court's finding that the plaintiff negligently performed his job during the chicken incident on June 16, thereby providing the defendant with good cause to discharge him. The determination of whether a party was negligent is ordinarily a question of fact. *See Seiders v. Testa*, 464 A.2d 933, 935 (Me.1983). As such, we review the factfinder's decision only for clear error. *See Harmon v. Emerson*, 425 A.2d 978, 981–82 (Me.1981). We cannot say that there is *no* competent evidence to support the trial court's finding that the plaintiff was negligent in his handling of the chicken incident. *See id.* at

982. As the trial court noted, the defendant has a substantial interest in avoiding negligence in the preparation of food to be served to its patients. We therefore uphold the trial court's finding that the defendant had reasonable cause to discharge the plaintiff.

In summary, the termination of the plaintiff's employment did not violate any obligation owed to the plaintiff by the defendant. The plaintiff failed to establish that his discharge was wrongful.

The entry is: Judgment affirmed.

All concurring.

---

7. The trial court actually found that there was a contract of employment for a definite period, namely, "a contract of employment [f]or a duration of time [(until retirement)] upon conditions." This finding was obviously an attempt to follow the law in effect at the time of the trial court's decision. *See Terrio*, 379 A.2d at 137–38.

In light of our decision in *Larrabee*, which we decided shortly before this case was argued on appeal, whether the term of employment in this case is viewed as definite or indefinite is no longer critical. *See* 486 A.2d at 99–100. Rather, the issue is what restrictions existed upon the defendant's right to discharge the plaintiff.