1997 ME 194

**Neil TALIENTO**

v.

**PORTLAND WEST NEIGHBORHOOD PLANNING COUNCIL.**

Supreme Judicial Court of Maine.

Argued April 9, 1997.
Decided Aug. 29, 1997.

---

Glenn Israel, Peter Rubin (orally), Bernstein, Shur, Sawyer & Nelson, Portland, for Appellant.

Melissa A. Hewey, Daniel J. Rose (Orally) Drummond, Woodsum & McMahon, Portland, for Appellee.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA and LIPEZ, JJ.

CLIFFORD, Justice.

[¶ 1]   Neil Taliento appeals from the judgment entered in the Superior Court (Cumberland County, *Mills, J.*), pursuant to a motion for a summary judgment, in favor of the Portland West Neighborhood Planning Council (Portland West) on his breach of employment contract claims.   Taliento contends that the court erred by finding there is no issue of material fact whether Portland West's Personnel Policies altered his status as an employee who could be terminated at will (Count I);  by finding he had no contractual right to an appeal process in which the president of the Board of Directors may cast a vote only to break a tie (Count II);  by finding that oral promises by Portland West's Executive Director Peter O'Donnell did not create an employment contract for a definite period of time and thereby limit O'Donnell's ability to recommend his termination (Count III);  and by finding no issue of material fact whether he was an intended third-party beneficiary of the federal Housing and Urban Development (HUD) grants that fund Portland West's YouthBuild Portland program (YouthBuild) and that he therefore did not have an employment contract for the grant's two-year duration

(Count IV). We are unpersuaded by Taliento's claims and affirm the judgment.

[¶ 2] Portland West is a neighborhood group that acts as an umbrella organization for a number of community programs funded primarily by federal, state, and local grants. In January 1990 Taliento was hired by Portland West as director of its Community Employment Project (CEP). He signed no employment contract and was not promised a specific duration of employment.

[¶ 3] As a program director, Taliento was regularly involved in hiring and terminating staff, and was familiar with Portland West's Personnel Policies, including those stipulating that such decisions required the approval of the Board of Directors. The Policies contain no promises of continued employment or employment for a specific term, do not limit termination of employment to situations of just cause, and do not provide criteria for employee discipline or termination. Paragraph 11 of the Policies provides:

> Termination: The Executive Director and the Program Director have the authority to recommend termination of an employee to the Personnel Committee only after documenting the problem; informing the employee and giving the employee a stated period to correct the situation. The employee may appeal any decision of the Personnel Committee to the full Board of Directors.

Executive Director Peter O'Donnell testified that in recommending the termination of another employee to the Personnel Committee later that year, he followed the Policies.

[¶ 4] In 1994 Portland West applied for a grant from HUD to fund a new program, YouthBuild. Taliento helped write the application (which apparently [1] listed him as program director), and that summer Portland West obtained the grant to fund YouthBuild for 18 months. Once the grant was awarded Taliento left CEP and became the YouthBuild director, but he signed no employment contract and there were no conversations concerning changes in his employment status. In December James Oliver was re-placed as Executive Director by O'Donnell. In the spring of 1995 Taliento completed an application for a two-year renewal of the HUD grant, that listed him as YouthBuild program director as well as all the other then current YouthBuild employees. O'Donnell admits that they intended for Taliento to continue as YouthBuild director for the duration of the grant. The grant was reviewed, and Taliento asserts that his salary as Youth-Build director was paid by it.

[¶ 5] In October 1995 O'Donnell issued a positive, written annual performance evaluation for Taliento, saying that he met or exceeded expectations in every category. When the two men met about the evaluation, O'Donnell gave him the maximum raise of five percent and, by Taliento's account, told him that "as long as [he] was executive director of Portland West, [Taliento] could count on having a job here." O'Donnell has testified that he may have said, "Neil, as long as I'm around, I would like you also working here." One month later, however, O'Donnell recommended to the Personnel Committee that Taliento be terminated on account of his handling of a situation involving a youth in the YouthBuild program who was wanted by the police. Although O'Donnell testified that in recommending Taliento's termination he met the requirements of paragraph 11 of the Policies, it is unclear that he did so. The Personnel Committee of the Board of Directors voted to terminate Taliento based on O'Donnell's recommendation. Shortly thereafter, O'Donnell informed Taliento that he had been terminated, and that he should clean out his desk and leave immediately. Taliento exercised his right of appeal, appealing the termination to the full Board. Following a hearing, the Board denied Taliento's request for reinstatement by a 7–7 vote, with President Bryant casting the tying and deciding vote.

[¶ 6] Taliento then filed the present complaint alleging four counts of breach of contract: failure to satisfy the Personnel Policies termination requirements (I), failure to adhere to established appeals practices (II), failure to honor the promise of continued employment allegedly made by O'Donnell

---

1. The 1994 grant application is not in the record.

(III), and failure to honor an implied two-year employment contract allegedly created by the HUD grant (IV). The court granted Portland West's motion for a summary judgment in its favor on all counts. This appeal is from the judgment.

[¶ 7] Pursuant to M.R. Civ. P. 56(c), a court properly enters a summary judgment if there is no genuine issue as to any material fact and a party is entitled to such a judgment as a matter of law. We review the entry of a summary judgment for errors of law, viewing the evidence in the light most favorable to the party against whom judgment was entered. *Lynch v. Ouellette*, 670 A.2d 948, 949 (Me.1996). We undertake an independent review of the record to determine whether there is a genuine issue of material fact and if the moving party was entitled to a judgment as a matter of law. *First Citizens Bank v. M.R. Doody, Inc.*, 669 A.2d 743, 744 (Me.1995).

[¶ 8] Taliento contends that the court erred by entering a summary judgment in Portland West's favor on Count I because there is a dispute of fact whether Portland West's Personnel Policies created an employment contract terminable only pursuant to its express terms, thereby altering his status as an employee who could be terminated at will. In particular, Taliento argues that Executive Director O'Donnell was bound to follow certain procedures pursuant to paragraph 11 of the Policies if he wanted to initiate a termination of Taliento, and that the language of paragraph 11 restricted Portland West's right to discharge Taliento. He claims that the paragraph's plain language required O'Donnell to document the performance problem at issue, inform Taliento of the problem, and give him "a stated period to correct the situation." Taliento also argues that O'Donnell's compliance with the graduated termination procedure set forth in paragraph 11 is a disputed issue of fact. He contends, therefore, that the existence of genuine issues of material fact precluded a summary judgment for Portland West on this count of his complaint. We disagree.

[¶ 9] "In Maine, it has long been the rule that a contract of employment for an indefinite length of time is terminable at the will of either party." *Larrabee v. Penobscot Frozen Foods*, 486 A.2d 97, 99 (Me.1984). Parties may provide that an employer is not free to discharge an employee without cause, but the intent to do so must be *clearly stated. Id.* at 99–100. Such a restriction cannot be implied from the employment contract. *Id.* at 99. Rather, the only exception to the employer's common law right to discharge an employee at will is a contract that "expressly restrict[s] [such a right] and clearly limit[s] the employer to the enumerated method or methods of terminating the employment." *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 155 (Me.1991) (citing *Libby v. Calais Reg'l Hosp.*, 554 A.2d 1181, 1183 (Me.1989)).

[¶ 10] In *Libby*, we made clear that language in an employee handbook (a document similar in relevant respects to a personnel policy), providing a method of discharge and implying that discharge of an employee will be only for cause, is insufficient to restrict the employer's common law right to terminate the employment. *Libby*, 554 A.2d at 1183.

[¶ 11] In this case, as in *Libby*, the personnel policy merely provides a procedure to be followed, a method of discharging an employee. It does not "clearly limit [Portland West] to that method of terminating [Taliento's] employment, and does not expressly restrict [Portland West's] right to discharge an employee." *Id.*

[¶ 12] Moreover, Taliento's claim is based on O'Donnell's failure to fully comply with some of the procedural provisions of paragraph 11 of the Personnel Policy. Taliento was discharged, however, not by O'Donnell, but by the Personnel Committee. The restriction in paragraph 11 is on the authority of the Executive Director and the Program Director and does not affect the authority of the Personnel Committee, nor that of the Board of Directors. Taliento also exercised his right to appeal to the Board of Directors and was afforded a full hearing. The failure of that appeal is insufficient reason to for us to discard or ignore the law that is clear and well-settled. The Superior Court correctly determined that a factual dispute as to the failure of the Executive Director to follow a

procedure in paragraph 11 of the Personnel Policy does not create a cause of action for wrongful discharge.

[¶ 13] Taliento's other contentions do not merit extensive consideration. There is nothing in the record to support a contract claim that Taliento was entitled to an appeal process in which the President of the Board could vote only to break a tie, and therefore no dispute of material fact exists on that point. Given O'Donnell's lack of authority to unilaterally hire Portland West employees as well as the indefinite nature of his promise, the oral promises he made to Taliento did not create an enforceable contract for a definite term of employment as a matter of law. There is no evidence that either Portland West or HUD intended to confer an enforceable benefit upon Taliento pursuant to the HUD grant awarded to fund YouthBuild; he was therefore at most an incidental beneficiary of the grant. *See Devine v. Roche Biomed. Labs.*, 659 A.2d 868, 870–71 (Me. 1995) (an incidental beneficiary cannot sue to enforce third party beneficiary rights); *Restatement (Second) of Contracts* § 302 (1981).

The entry is:

Judgment affirmed.

LIPEZ, Justice, dissenting, with whom ROBERTS and DANA, JJ., join.

[¶ 14] I must respectfully dissent because the court's decision perpetuates the misapplication of special rules of contract law to claims that an employment contract of indefinite duration precludes at will termination. In my view, the record presented on Taliento's appeal provides an appropriate basis for revisiting our precedents in this area, reconsidering the extent to which an employment handbook or personnel policy that purports to govern termination may constitute a binding contract, and clarifying the principles of contract law to be applied in these employment cases.

I.

[¶ 15] An employment contract is terminable at will unless the parties specify that the contract is for a definite term, *Terrio v.*

*Millinocket Community Hosp.*, 379 A.2d 135, 137 (Me.1977), or that it is terminable only pursuant to its express terms, *Larrabee v. Penobscot Frozen Foods, Inc.*, 486 A.2d 97, 99–100 (Me.1984). In *Terrio* we held that the employer's oral promises that the plaintiff was secure in her job for "the rest of [her] life" and that she would be employed until "normal retirement age," because made "in the context of [the employee's] long service in a position of substantial responsibility (from which she would normally have retired in less than seven years), provided the critical evidentiary support for her contract claim." 379 A.2d at 138. We also noted that

[t]he [employer's] acquiescence in the expanded scope of the contract issue at trial showed the parties' willingness to go beyond the narrow issue posed by the pleadings and to try by implied consent the issue of *whether a contract of employment for a definite term arose from the total factual circumstances*, . . . .

*Id.* (emphasis added). Thus, we concluded that an employment contract for a definite term could be implied in fact because we based our holding on the circumstances and conduct surrounding the oral promises made to the plaintiff. *See Restatement (Second) of Contracts* § 4 cmt. a (1981) (*"Express and implied contracts.* Contracts are often spoken of as express or implied. The distinction involves no difference in legal effect, but lies merely in the mode of manifesting assent. Just as assent may be manifested by words or other conduct, sometimes including silence, so intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance."); § 5 cmt. a (*"Agreed terms.* The terms of a promise or agreement are those expressed in the language of the parties or implied in fact from other conduct. Both conduct and language are to be understood in the light of the circumstances, including course of dealing or usage of trade or course of performance."); *see also Perry v. Sindermann*, 408 U.S. 593, 601–02, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972) ("the law of contracts in most, if not all, jurisdictions has long employed a process by which agree-

ments, though not formalized in writing, may be 'implied.' Explicit contractual provisions may be supplemented by other agreements implied from 'the promisor's words and conduct in light of the surrounding circumstances.' And, '[t]he meaning of [the promisor's] words and acts is found by relating them to the usage of the past.'") (citations omitted). Although *Terrio* addresses a claim of an employment contract for a definite term, our recognition of the implied in fact model of contract formation in that case is significant for our consideration of the development of the law subsequent to *Terrio* in cases involving contracts of indefinite duration.

[¶ 16] In *Larrabee,* the plaintiffs asserted that they "expressly or impliedly promised to work for the Defendant ... [and that i]n exchange for the Plaintiffs' promises, the Defendant expressly or impliedly promised to pay [them] a specified wage and to refrain from discharging them in bad faith or without good cause." 486 A.2d at 98. The plaintiffs also asserted that their employment contract included terms and conditions contained in the "General Policy" and "Work Rules" issued by the employer. *Id.* We noted that

[w]hile the employment of much of the country's labor force is governed by the terminable at will rule, a substantial percentage of the labor force is protected by collective bargaining agreements or are employed by federal or state governments, and can generally be discharged only for "just cause." There is no reason why individuals not otherwise given this protection and their employers should not be free to contract against discharge without good cause, as the Plaintiffs in the instant case allege they did.

*Id.* at 99 (citation omitted). We then held that "parties may enter into an employment contract terminable only pursuant to its express terms—as 'for cause'—by clearly stating their intention to do so, even though no consideration other than services to be performed or promised is expected by the employer, or is performed or promised by the employee." *Id.* at 99–100. Accordingly, we held that the plaintiffs' complaint was sufficient to withstand the motion to dismiss. *Id.* at 100.

[¶ 17] *Larrabee's* establishment of an exception to the employment-at-will rule was significant in two respects. For the first time we recognized that a provision for job security in a contract of indefinite duration could be binding without additional, independent consideration other than the services to be performed by the employee.[2] Second, our holding did not limit the exception to the employment-at-will rule to those contracts that provide explicitly that termination can be for cause only. Our opinion alludes to "for cause" only as an example of an express term pursuant to which such a contract could be terminable. *Id.* at 99 ("as 'for cause'") (emphasis added); *see Wyman v. Osteopathic Hosp. of Maine, Inc.,* 493 A.2d 330, 334 (Me.1985) ("In *Larrabee* ... we held that parties may agree to an employment of indefinite length that is terminable by the employer only pursuant to particular terms, *such as* for good cause.") (emphasis added).

---

**2.** The rule set forth in *Larrabee* can be understood in terms of the requirements for a unilateral contract. A unilateral contract consists of a promise by one party which invites performance by the other party. 1 Arthur L. Corbin et al., Corbin on Contracts § 1.23, at 89 (rev. ed.1993). The promise "will not be an enforceable contract unless consideration has been given in return for it, or unless there has been some expression of assent to the delivery of a document containing the promise.... If this consideration is an action or forbearance instead of a promise, the resulting contract is 'unilateral.'" *Id.* Thus, a promise of employment on particular terms of unspecified duration may create a binding unilateral contract. *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 626 (Minn.1983). Handbook language can constitute an offer, one which is communicated by the handbook's dissemination to the employee, and the employee can accept the offer by retaining employment with knowledge of the conditions, which thereby become contractual obligations. *Id.* at 626–27. By accepting or staying on the job despite the freedom to decline employment or quit, the employee supplies the necessary consideration for the offer; that is, no additional, independent consideration is required for the formation of the unilateral contract. *Id.* at 627. As one court has explained: "An employer's offer of a unilateral contract may very well appear in a personnel handbook as the employer's response to the practical problem of transactional costs. Given these costs, an employer ... may prefer not to write a separate contract with each individual employee." *Id.*

We thereby indicated that the relevant contractual term could consist of procedural protections (e.g., a particular method of termination), rather than an enumeration of substantive standards or even the recitation of the magic words "for cause."

[¶ 18] However, our position in *Larrabee* on the implied in fact model of contract formation we recognized in *Terrio* is unclear. We stated that the plaintiffs "assert an implied contract.... [t]hey further assert that this contract included terms and conditions contained in the writings entitled 'General Policy' and 'Work Rules,'" and noted that pursuant to the employment-at-will rule "the Plaintiffs' allegations that the Defendant had entered into an *implied* contract to discharge them only in good faith and for good cause would be fatally deficient." *Larrabee*, 486 A.2d at 98–99 (emphases added). We concluded by holding that "this contract claim"—ostensibly the implied contract claim referenced earlier—is sufficient to withstand the motion to dismiss.[3] *Id.* at 100. The new rule, however, allows employees and employers to enter into a "contract terminable pursuant to its *express terms*" only "by *clearly stating their intention to do so*," *id.* at 99–100 (emphases added), a requirement that is seemingly irreconcilable with an implied in fact model of contract formation.

[¶ 19] Moreover, in *Larrabee* we stated that the new exception is "identical or ... similar" to those "carved out" by other courts, and we cited five cases from other jurisdictions in a footnote. *Id.* at 100 n. 4. Although three of those cases allow for the implication of such terms and two do so explicitly,[4] the two cases cited whose language is identical to that set forth in *Larrabee* do not. *Littell v. Evening Star Newspaper Co.*, from which the *Larrabee* rule is drawn verbatim, asserts that

> the parties may enter into a contract for permanent employment—not terminable except pursuant to its express terms—by stating clearly their intention to do so, even though no other consideration than services to be performed is expected by the employer or promised by the employee. The meaning of the cases previously referred to is that *where no such intent is clearly expressed and, absent evidence which shows other consideration than a promise to render services, the assumption will be that*—even though they speak in terms of 'permanent' employment—*the parties have in mind merely the ordinary business contract* for a continuing employment, terminable at the will of either party.

120 F.2d 36, 37 (D.C.Cir.1941) (emphases added); *see also Shah v. American Synthetic Rubber Corp.*, 655 S.W.2d 489, 492 (Ky.1983) (same). Thus, according to the cases from which the *Larrabee* rule is drawn, there must be a clear statement of the parties' intention to depart from the employment-at-will rule pursuant to express terms, unless consider-

---

**3.** Although, as one commentator has noted,

> the allegations delineated in the opinion with regard to the implied contract ... are the only allegations in the opinion that support the allegations of an express contract as well. Thus, the employee would appear to have characterized his allegations as both an express and implied contract. It may very well have been that the case survived a motion to dismiss on the basis of an express contract with factual allegations virtually identical to those in *Libby*.

Russell Goldsmith, Note, *Libby v. Calais Regional Hospital: Contracting Out of Maine's Employment-at-Will Doctrine*, 42 Me. L.Rev. 553, 558 n. 35 (1990).

**4.** *See Strauss v. A.L. Randall Co., Inc.*, 144 Cal. App.3d 514, 194 Cal.Rptr. 520, 522 (1983) ("employee and employer can contract out of the employment-at-will presumption where (1) the contract was supported by consideration independent of the services to be performed by the employee, or (2) the parties agreed, expressly or impliedly, that the employee could be terminated only for good cause."); *Drzewiecki v. H & R Block, Inc.*, 24 Cal.App.3d 695, 101 Cal.Rptr. 169, 174 (1972) ("It is fundamental that when construing contracts involving substantial employment rights, courts should avoid mechanical and arbitrary tests if at all possible; employment contracts, like other agreements, should be construed to give effect to the intention of the parties as demonstrated by the language used, the purpose to be accomplished and the circumstances under which the agreement was made.... We embrace the prevailing viewpoint that the general rule is a rule of construction, not of substance, and that a contract for permanent employment, whether or not it is based upon some consideration other than the employee's services, cannot be terminated at the will of the employer if it contains an express or implied condition to the contrary.").

ation in addition to the employee's services is demonstrated.[5] An express statement of intent functions as an acceptable substitute for additional consideration. Although our decision in *Larrabee* could be construed as a rejection of implied in fact contract claims in the employment context, there was a lingering ambiguity on the issue because of the procedural posture of the case and the precedents cited.

[¶ 20] To the extent that *Larrabee* left unresolved the viability of implied contract claims in altering the employment-at-will rule, we resolved that ambiguity in *Libby v. Calais Reg'l Hosp.*, 554 A.2d 1181 (Me.1989), by indicating that exceptions to the employment-at-will rule would be limited to express contracts. In addition to reiterating the *Larrabee* requirement that the parties clearly state their intention to enter into a contract terminable only pursuant to its express terms, we cited that case as authority for the proposition that an employee handbook[6] "must *clearly state an intent to impose restrictions* upon the employer's right to discharge the employee." *Id.* at 1183 (citing 486 A.2d at 99–100) (emphasis added). We found that "Libby did not present any evidence of an *express restriction* on the [employer's] common law right to discharge her at will." 554 A.2d at 1183 (emphasis added). We thereby rejected, in the employment-at-will context, the applicability of the implied in fact model of contract formation, a model equivalent in legal effect to that of express contract formation.[7] Furthermore, as to the terms of the alleged contract, we concluded that the handbook at issue "merely provides

a method of discharge and implies that discharge will be for cause only"; that it "does not ... clearly limit the [employer] to that method of terminating Libby's employment, and does not expressly restrict the [employer's] right to discharge an employee"; and that "[w]ritten or oral language merely implying that discharge is for cause only is not sufficient to bind an employer." *Id.* (citations omitted).

[¶ 21] *Bard v. Bath Iron Works Corp.*, 590 A.2d 152 (Me.1991), confirmed the turn we took in *Libby.* In that case we addressed an employee's claim that the court had erred in entering a summary judgment in favor of the employer on his claim that a "Rules and Regulations" pamphlet he received on commencing his employment created an implied contract by which he could be discharged only for a violation of one of the rules or regulations. *Id.* at 155. We reasserted that a contract creating an exception to the employment-at-will rule "must expressly restrict the employer's common law right to discharge the employee at will and clearly limit the employer to the enumerated method or methods of terminating the employment," *id.* at 152 (citing *Libby,* 554 A.2d at 1183), reiterated that language implying that discharge is for cause only is insufficient, *id.,* and noted that the record was devoid of the "the requisite clear statement of intention[ ] that [the employer] would discharge [the employee] only for cause." *Id.* at 155. Thus *Bard* was a further rejection of the implied contract model in our evaluation of employment contracts of indefinite duration.

---

5. *See Littell v. Evening Star Newspaper Co.*, 120 F.2d 36, 37 (D.C.Cir.1941) (additional consideration may consist in "making an investment in the business, ... resigning from government service, ... giving up [an employee's] own business, or ... relinquishing an acknowledged right to recover for injury which [an employee] has suffered").

6. In *Libby* we asserted for the first time that "[t]he terms of an employment handbook can be used as the means by which an employment contract may be changed from one terminable at will to one terminable only by its express terms." 554 A.2d at 1183 (citing *Toussaint v. Blue Cross & Blue Shield of Mich.*, 408 Mich. 579, 292 N.W.2d 880, 894 (1980)).

7. In *Libby* we departed from the application of traditional contract principles in another respect. The provisions of the handbook at issue in *Libby* could have been read as tantamount to a "for cause" standard for dismissal; indeed, our opinion asserts that the handbook "implie[d] that discharge will be for cause only." 554 A.2d at 1183. To the extent that we found the provisions in the handbook and related documents were ambiguous and conflicting, we chose to construe them in favor of the employer, 554 A.2d at 1183, despite the well-established rule that ambiguity is to be construed against the drafter. *See John Swenson Granite, Inc. v. State Tax Assessor*, 685 A.2d 425, 428 (Me.1996) (citing *T–M Oil Co., Inc. v. Pasquale*, 388 A.2d 82, 86 (Me.1978) (quoting *Monk v. Morton*, 139 Me. 291, 295, 30 A.2d 17, 19 (1943))).

[¶ 22] Although we rejected ordinary contract principles in *Larrabee, Libby,* and *Bard* without explaining the need to do so, we may have been concerned by a perceived lack of mutuality of obligation. That is, we may have been concerned that pursuant to the alleged employment contracts of indefinite duration the employee remains free to depart at any time whereas the employer is bound by a promise not to terminate except for cause or unless certain procedures are followed. However, the "demand for mutuality of obligation, though appealing in its symmetry, is simply a species of the forbidden inquiry into the adequacy of consideration.... 'If the requirement of consideration is met, there is no additional requirement of ... equivalence in the values exchanged; or ... mutuality of obligation.'" *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 629 (Minn.1983) (quoting *Restatement (Second) of Contracts,* § 79). In this context, an employee's continued performance despite the freedom to leave supplies consideration for an employer's promises. *Id.*

[¶ 23] We have not articulated in *Larrabee, Libby,* or *Bard* a sufficient reason for our departure from ordinary contract principles in our consideration of employment contracts of indefinite duration, and the court does not do so in this case. Our departure runs counter to the trend in the majority of jurisdictions.[8] We should end this diver-

---

8. As of this writing, 38 jurisdictions have recognized that implied employment contracts may be found on the basis of language in employee handbooks and in other personnel policies that restricts an employer's right to discharge an employee to particular reasons ("for cause") or procedures for termination. *Hoffman–LaRoche, Inc. v. Campbell,* 512 So.2d 725, 728–34 (Ala.1987); *Jones v. Central Peninsula Gen. Hosp.,* 779 P.2d 783, 787 (Alaska 1989); *Leikvold v. Valley View Community Hosp.,* 141 Ariz. 544, 688 P.2d 170, 174 (1984); *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 223, 765 P.2d 373, 385 (1988); *Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708, 711–12 (Colo.1987); *Finley v. Aetna Life & Cas. Co.,* 202 Conn. 190, 520 A.2d 208, 213 (1987), *rev'd on other grounds,* 225 Conn. 782, 626 A.2d 719 (1993); *Sisco v. GSA Nat'l Capital Fed. Credit Union,* 689 A.2d 52, 54–55 (D.C.1997); *Kinoshita v. Canadian Pacific Airlines, Ltd.,* 68 Haw. 594, 724 P.2d 110, 117 (1986); *Parker v. Boise Telco Fed. Credit Union,* 129 Idaho 248, 923 P.2d 493, 497 (1996); *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.,* 115 Ill.2d 482, 106 Ill.Dec. 8, 11–12, 505 N.E.2d 314, 317–18 (1987); *Anderson v. Douglas & Lomason Co.,* 540 N.W.2d 277, 282–84 (Iowa 1995); *Morriss v. Coleman Co., Inc.,* 241 Kan. 501, 738 P.2d 841, 847–49 (1987); *Bagwell v. Peninsula Reg'l Med. Ctr.,* 106 Md.App. 470, 665 A.2d 297, 308–09 (1995), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996); *O'Brien v. New England Tel. & Tel. Co.,* 422 Mass. 686, 664 N.E.2d 843, 847–49 (1996); *Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 292 N.W.2d 880, 893–94 (1980); *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 630 (Minn.1983); *Bobbitt v. The Orchard, Ltd.,* 603 So.2d 356, 361 (Miss.1992); *Hebard v. AT & T,* 228 Neb. 15, 421 N.W.2d 10, 12 (1988); *Southwest Gas Corp. v. Vargas,* 111 Nev. 1064, 901 P.2d 693, 697–98 (1995); *Woolley v. Hoffmann–LaRoche, Inc.,* 99 N.J. 284, 491 A.2d 1257, 1264–68 (1985); *Hartbarger v. Frank Paxton Co.,* 115 N.M. 665, 857 P.2d 776, 779–80 (1993); *Bailey v. Perkins Restaurants, Inc.,* 398 N.W.2d 120, 122–23 (N.D.1986); *Mers v. Dispatch Printing Co.,* 19 Ohio St.3d 100, 483 N.E.2d 150, 154 ( 1985); *Gilmore v. Enogex, Inc.,* 878 P.2d 360, 368 (Okla.1994); *Yartzoff v. Democrat–Herald Publ'g Co.,* 281 Or. 651, 576 P.2d 356, 359 (1978); *Fleming v. Borden, Inc.,* 316 S.C. 452, 450 S.E.2d 589, 595–96 (1994); *Butterfield v. Citibank of South Dakota, N.A.,* 437 N.W.2d 857, 859 (S.D.1989); *Hooks v. Gibson,* 842 S.W.2d 625, 628 (Tenn.Ct.App.), appeal denied, (Tenn. 1992); *Arnold v. B.J. Titan Servs. Co.,* 783 P.2d 541, 543 (Utah 1989); *Taylor v. National Life Ins. Co.,* 161 Vt. 457, 652 A.2d 466, 471 (1993); *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081, 1087–88 (1984); *Cook v. Heck's, Inc.,* 176 W.Va. 368, 342 S.E.2d 453, 459–60 (1986); *Mobil Coal Producing, Inc. v. Parks,* 704 P.2d 702, 707 (Wyo.1985); *see also Manser v. Missouri Farmers Ass'n, Inc.,* 652 F.Supp. 267, 273 (W.D.Mo.1986) (construing Missouri law); *Barger v. General Elec. Co.,* 599 F.Supp. 1154, 1163–64 (W.D.Va.1984) (construing Virginia law); *Streckfus v. Gardenside Terrace Cooperative, Inc.,* 504 N.E.2d 273, 275 (Ind.1987) (dictum); *Ferraro v. Koelsch,* 124 Wis.2d 154, 368 N.W.2d 666, 668 (1985) (dictum). In one state an employer's violation of express provisions of its own written personnel policy constitutes a statutory cause of action for wrongful discharge. Mont.Code Ann. § 39–2–904 (1996).

Several jurisdictions also have held that even if the requisites for contract formation are not found, the employee would be entitled to enforce the termination procedures pursuant to a theory of promissory estoppel by demonstrating that the employer should reasonably have expected the employee to consider an employee manual or policy as a commitment from the employer to follow the termination procedures, that the employee reasonably relied on the termination procedures to his or her detriment, and that injustice can be avoided only by enforcement of the

gence and apply the law of contracts implied in fact to employment contracts of indefinite duration. Pursuant to the employment-at-will rule, any employment contract that has no specified term of duration is an at-will relationship, unless the employee shows that the parties expressly or impliedly agreed to terminate the relationship only for particular reasons or by a particular method. The at-will rule is merely a rule of construction, not a substantive limitation on contract formation. *Pine River*, 333 N.W.2d at 628. Also, it is not a presumption in the evidentiary sense of shifting a burden of proof or adding to the burden of proof. An employee who is a party to an alleged contract of indefinite duration has the burden faced by any plaintiff trying to establish a claim—in this instance, establishing by a preponderance of the evidence that there is a contract of indefinite duration containing job security provisions in the form of "for cause" protections or specific methods of discharge. Whether a contract may be implied from an employee handbook or other documents, oral promises, the conduct of the parties, and other circumstances is a question of fact for a jury to decide. *See Lawson v. McLeod*, 152 Me. 67, 69, 123 A.2d 199, 200 (1956) (court erred in taking case from jury when facts and circumstances presented question whether there was an implied contract); *Colvin v. Barrett*, 151 Me. 344, 352, 118 A.2d 775, 779 (1955) ("The issue is one of fact, whether under the circumstances of the particular case the services were rendered on the basis of contractual relation, either express or implied."); *Bryant v. Fogg*, 125 Me. 420, 425–26, 134 A. 510 (1926) (whether there is an implied contract is a question of fact "peculiarly the province of the jury"); *see also Taylor v. Nat'l Life Ins. Co.*, 161 Vt. 457, 652 A.2d 466, 469–71 (1993) (jury question whether there was implied contract allowing discharge only for good cause created by personnel policy manual, oral representations to employee, and ambiguous hiring letter);

*Toussaint v. Blue Cross & Blue Shield of Mich.*, 408 Mich. 579, 292 N.W.2d 880, 891–92 (1980) (whether employer's supervisory manual and guidelines created contractual rights such that the employment relationship is not terminable at will is question of fact for the jury).[9]

## II.

[¶ 24] Given the above considerations, I conclude that the record at hand raises a dispute of material fact whether the Portland West Personnel Policies and the surrounding circumstances created an employment contract terminable pursuant to its express terms. Unlike the documents at issue in *Libby*, 554 A.2d at 1183, the Policies at issue here include no language disclaiming an intent to create a contract. Whereas the handbook in *Libby* did not limit the employer to a particular method of termination, paragraph 11 of Portland West's Policies sets forth the only procedure pursuant to which the executive director is authorized to initiate a termination. Whether the Board of Directors could have terminated Taliento by following some other procedure is irrelevant because Taliento's termination was in fact begun by then Executive Director O'Donnell, and the Personnel Committee, not the Board, decided to terminate Taliento on O'Donnell's recommendation alone. The Board then heard an appeal from the decision of the Personnel Committee, as provided for in paragraph 11.

[¶ 25] Furthermore, the record includes ample evidence that paragraph 11 was generally understood to be the mandatory method of termination: both O'Donnell and two board members testified in depositions that he had to comply with paragraph 11 in terminating Taliento; Taliento testified to his familiarity with the Personnel Policies as a program director who was regularly involved in the hiring and firing of staff; in June 1995, when Taliento told O'Donnell that he wanted to terminate a staff member, O'Donnell re-

termination procedures. *See, e.g., Cleary v. American Airlines, Inc.*, 111 Cal.App.3d 443, 168 Cal.Rptr. 722, 729 (1980); *Continental Air Lines, Inc.*, 731 P.2d at 712; *Kelly v. Georgia–Pacific Corp.*, 46 Ohio St.3d 134, 545 N.E.2d 1244, 1250 (1989); *Taylor*, 652 A.2d at 471; *Thompson*, 685 P.2d at 1087–88.

9. For a helpful discussion of the issues raised by our law on employment-at-will contracts, see Jeffrey A. Thaler, *The Common Law of Employment Law in Maine: It's Broke and Needs Fixing*, 10 Me. B.J. 316 (1995); Elliott L. Epstein, *The Demise of Breach of Employment Contract and Wrongful Discharge Cases*, 8 Me. B.J. 242 (1993).

minded him (in a conversation documented by O'Donnell's handwritten notes) that he could not do so without following the paragraph 11 procedures; and O'Donnell admitted that he followed the requirements when recommending the termination of another employee to the Board's Personnel Committee later that year.[10] In sum, the documents and deposition evidence raise an issue of material fact sufficient to warrant a jury's determination whether there was a contract implied in fact between Taliento and Portland West such that Executive Director O'Donnell had to follow the requirements of paragraph 11 if he wanted to terminate Taliento's employment.

[¶ 26] Assuming the Policies were contractually binding, the record raises another dispute of fact whether O'Donnell complied with the paragraph 11 procedures, that is, whether his actions constituted a breach of the employment contract. In particular, in his deposition testimony O'Donnell claimed that he had followed the provisions of paragraph 11 before recommending termination to the Personnel Committee, and yet he admitted that he had "informed [Taliento] of the problem with communication numerous times during the year, orally and in writing, specifically in writing the employee evaluation," and that he had documented the "communication" problem in the evaluation only. When asked how he had given Taliento "a stated period to correct the situation," O'Donnell responded that "[t]here were numerous oral meetings where I told Mr. Taliento that he needed to be more of a team player, needed to do a better job communicating. I informed the employee throughout the year. This was an issue that we came back to over and over again." Thus, O'Donnell's deposition testimony arguably reveals that he did not follow his own understanding of how the paragraph 11 requirements had to be satisfied, i.e., in writing. Moreover, as noted, Taliento had just received an evaluation that was positive and disclosed no "situation" so serious as to require remedy within a specific period. Indeed, on the basis of that evaluation, Taliento received the highest

raise given to Portland West staff. Thus, O'Donnell's evaluation of Taliento could not have served notice that there was a performance problem Taliento needed to remedy within a particular period of time to avoid being terminated. Also, those involved in the decision to terminate Taliento testified that they did so based on his handling of the incident involving a youth in the YouthBuild program who was wanted by the police, as reported to them by O'Donnell, and not due to a general concern about communication, the only problem identified by O'Donnell in his deposition testimony.

[¶ 27] For these reasons, I would vacate the summary judgment as to Count I and remand that breach of contract claim for trial.

10. Portland West claims that paragraph 11 was intended to apply only to the termination of subordinate employees rather than to that of executive or program directors, but provides no documentation for that assertion.