STATE OF MAINE                                    SUPERIOR COURT
YORK, SS.                                         CIVIL ACTION
                                                 DOCKET NO. CV-14-33


DOMINATOR GOLF, LLC,


Plaintiff,


v.                                               **ORDER**


PINE RIDGE REALTY CORP.,
BARBARA A. BOUTET, INC. and
RONALD A. BOUTET,


Defendants.

## I.  Background

Plaintiff Dominator Golf, LLC, brought this action against Defendants Pine Ridge Realty Corp., Barbara A. Boutet, Inc. and Ronald A. Boutet. The one-count complaint seeks a declaratory judgment that a Memorandum of Understanding the parties entered into is void and unenforceable. Defendants answered and counterclaimed for breach of contract, intentional misrepresentation, and requested damages. Before the court are cross-motions for summary judgment.

The Dunegrass Development is a 309-acre parcel of land in Old Orchard Beach. (Def.'s S.M.F. ¶ 1.) Dunegrass has a number of restrictive covenants set forth in a single governing document, titled "Declaration of Covenants, Conditions and Restrictions for Dunegrass Community Development Assocaition, Inc." ("DCCR"). Dunegrass received approvals from State and local authorities to create a residential subdivision that will be developed as a cluster of condominium projects. (Id. ¶ 2.) Those approvals have been

1

modified over time. Ronald Boutet and his wife Barbara Boutet, acting through Sealand Development Company, Inc. ("Sealand"), were the original purchasers of Dunegrass. (Id. ¶ 1.)

An eighteen-hole golf course ("the Golf Course") is integrated into Dunegrass. (Def.'s S.M.F. ¶ 6.) Pursuant to the DCCR, Sealand removed the golf course from the development and conveyed the land to Pine Ridge Realty Corp., which is also controlled by the Boutets. (Id. ¶ 7.) On December 5, 2008, Pine Ridge and Dominator Golf, LLC, entered into a Purchase and Sale Agreement to convey nearly all of the Golf Course (several residential lots were carved out), together with an additional area designated for maintenance and storage ("the Maintenance Area"), to Dominator. (Id. ¶ 8.) The transaction was finalized and closed in March 2009. (Id. ¶ 9.)

Dominator is controlled and operated by Domenic Pugliares. (Def.'s S.M.F. ¶ 10.) On October 6, 2011, Pugliares contacted Ron Boutet about acquiring the rights to develop within the Maintenance Area and the 13th hole of the Golf Course. (Id.) The parties exchanged several emails. In relevant part, one of Pugliares' October 6 emails states: "I know you are aware that I am splitting off some lots from the golf course. The process could be quickened by months if you would give me 15 of the lots that you control." (Id. ¶ 11.) In a follow up email the same day, Pugliares stated "let me be clear if I wasn't I am not looking for actual lots I have the land I just would like 15 of your approvals." (Id. ¶ 12.)[1]

In August 2012, Dominator and the Defendants entered into a Memorandum of Understanding ("MOU"). (Def.'s S.M.F. ¶ 13.) The MOU called for Defendants to

---

[1] By "approvals," Pugliares was referring to 15 of the 589 residential lots approved by the Town and DEP in 1989. The nature of this initial approval and the organization of the Dunegrass development sections will be further explained and examined below.

2

"development rights" to proceed with development. Defendants deny that any false representation as made, and even if one were, there was no inducement and no reliance. Regarding consideration, Dominator maintains that the "development rights" referred to in the MOU do not exist and therefore have no value and cannot serve as consideration. Defendants reply that the development rights do exist, and whether they were necessary for Dominator to proceed with the project is immaterial so long as they conferred some benefit. Defendants primarily argue that the transfer of the rights under the MOU and representations to DEP and the Town expedited permitting and approval process.

Development rights most often arise in the condominium context and are rights created and controlled by the condominium's declaration. *See, e.g.*, 33 M.R.S. § 1602-105(A)(8); 33 M.R.S. § 1602-110(A). They can also be created and regulated by ordinance. *See Kittery Retail Ventures, LLC v. Town of Kittery*, 2004 ME 65, ¶ 2, 856 A.2d 1183 (retail development rights transferable pursuant to Town ordinance). Although development rights are intangible, they have value. For example, if development rights expire or are not reserved by the declarant, a developer would not be able to proceed to declare, construct, and add units to a project. *See Seagull Condo. Ass'n v. First Coast Realty & Dev.*, 2011 Me. Super. LEXIS 117, *13 (Me. Super. Ct. July 19, 2011); *see also Acorn Vill. Condo. Assoc. v. Acorn Vill. LLC*, 2015 Me. Super. LEXIS 91, *4 (Me. Super. Ct. May 20, 2015) (development rights expired pursuant to terms of the declaration, leaving declarant without rights in unfinished condominium unit areas).

The nature of the "development rights" recited in the MOU and understood by the parties is not clear from the summary judgment record. This stems in part from the complicated governance structure of Dunegrass and the initial Town and DEP approvals

6

transfer to Dominator "development rights to up to fifteen unit sites from the unused inventory of unit sites in Section B . . . to allow Dominator to apply to the Old Orchard Beach Planning Board for the development of the Maintenance Area." (Id. ¶ 14.) In return for the transfer, Dominator agreed "to pay Pine Ridge the sum of $15,000 per lot or unit site from the sale proceeds of such lots or unit sites." (Id.) The MOU also provides for Dominator to receive "development rights to up to four (4) unit sites from the unused inventory of unit sites in Section B . . . to allow Dominator to apply to the Old Orchard Beach Planning Board for the development of single family lots or unit sites in the area along the southeasterly side of Wild Dunes Way and the northwesterly side of Hole 13" for "$20,000 per lot or unit sit from the sale proceeds of such lots or unit sites." (Id.)

Dominator thereafter obtained approval from the Maine DEP and the Town for two subdivisions on the land: the "Hole 13 Subdivision" and the "Hole 16 Subdivision." (Def.'s S.M.F. ¶ 18.) Dominator represented to both DEP and the Town that it held development rights to the land. (Id. ¶ 19.) The DEP approval noted Dominator held development rights; DEP did not, however, rely on the rights in granting Dominator's approval. (Pl.'s Resp. Def.'s S.M.F. ¶ 19.) Dominator has since transferred eleven Hole 16 Subdivision lots and two Hole 13 subdivision lots. (Def.'s S.M.F. ¶ 22.)

Pine Ridge has requested payments from the lot sale proceeds pursuant to the MOU. (Def.'s S.M.F. ¶ 23.) Dominator has refused on the grounds the MOU is unenforceable. (Pl.'s Resp. Def.'s S.M.F. ¶ 23.) The parties dispute whether Boutet represented that purchasing development rights were necessary for Pugliares to develop units in the Maintenance Area or Golf Course. (Id. ¶ 15.) The parties further dispute

3

whether the development rights had value, and whether the price was fair and equitable. (Id. ¶¶ 16-17.)

Lastly, the parties dispute whether the Ninth Hole should be moved as reflected on a plan of Dunegrass; Dominator refused to move the hole. A portion of the Ninth Hole land was supposed to be used for access roads and Defendants allege is interfering with their ability to develop Sections D and E of Dunegrass. (Def.'s S.M.F. ¶ 24.) Dominator argues that Defendants have not designated the necessary expert to testify the boundary and thus cannot prove their claim to the area. (Pl.'s Resp. Def.'s S.M.F. ¶ 24.)

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate where there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *Gagne v. Stevens*, 1997 ME 88, ¶ 8, 696 A.2d 411. "When contract language is ambiguous or uncertain, its interpretation is a question of fact to be determined by the fact finder; when the language is clear, its interpretation is a question of law for the court." *Id.* The same standards under Rule 56 apply to cross-motions for summary judgment. *F.R. Carroll, Inc. v. TD Bank, N.A.*, 2010 ME 115, ¶ 8, 8 A.3d 646.

### B. The Enforceability of the MOU

Dominator maintains the MOU is unenforceable for (1) fraud because the agreement was based on Boutet's false representations that development rights were required to obtain approvals from the DEP and Town, or alternatively for (2) failure of consideration because the development rights do not exist, have no value, and therefore cannot constitute consideration for the promise to pay.

4

### 1. Fraud

A party may avoid enforcement of a contract that was procured by fraud. The elements of fraud in the inducement require the party seeking to avoid enforcement of the contract establish by clear and convincing evidence:

(1) A party made a false representation,
(2) The representation was of a material fact,
(3) The representation was made with knowledge of its falsity or in reckless disregard of whether it was true or false,
(4) The representation was made for the purpose of inducing another party to act in reliance upon it, and
(5) The other party justifiably relied upon the representation as true and acted upon it to the party's damage.

*Barr v. Dyke*, 2012 ME 108, ¶ 16, 49 A.3d 1280.

### 2. Consideration

"Consideration can either be a benefit to the promisor or a detriment to or forbearance by the promisee." *Kennebunk Sav. Bank v. West*, 538 A.2d 303, 304 (Me. 1988). The Law Court endorses the Restatement view that the exchanged promises need not be balanced to constitute consideration. *See Taliento v. Portland W. Neighborhood Planning Council*, 1997 ME 194, ¶ 22, 705 A.2d 696 (citing Restatement (Second) of Contracts § 79). In fact, a penny or a peppercorn would be adequate consideration to support a contract. *See Whitney v. Stearns*, 16 Me. 394, 397 (1839) ("A cent or a pepper corn, in legal estimation, would constitute a valuable consideration."). So long as the party got the benefit of the bargain, the court will not second-guess the actual value of the promise exchanged.

### 3. The "Development Rights" At Issue

Dominator asserts that Boutet fraudulently induced the plaintiff to enter the MOU by making false representations about the existence and necessity of purchasing

5

for the development in 1989. According to Defendants, the source of the development rights recited in the MOU is the DCCR and the Town and DEP's original approval of Dunegrass a 589-unit residential subdivision. Dunegrass is divided into sections labeled "A" through "R" depicted on the Dunegrass plan. (Def.'s S.M.F. ¶ 2.) While Dunegrass was approved as a whole and the DCCR applies to all sections, in reality, the project is a cluster of condominium projects governed by separate declarations, not a unified condominium association. (Id. ¶ 3.) The DCCR provides that the number of units developed in each section ("A" through "R") will be limited to the number designated on the plan. (Id. ¶ 5.)

According to Defendants, because the residential units cannot exceed the 589 units approved by the Town and DEP in 1989, the "development rights" are the right to proceed with existing approvals that must be transferred or re-allocated from other sections of Dunegrass in order to "facilitate amendments" to the Dunegrass DCCR. (Boutet Aff. #2 ¶ 9.) By way of example, Boutet had previously transferred approvals for units in Section B to Section H as required by the Town to obtain approval for a new five-unit development. (Boutet Aff. # ¶ 10.) Thus, in Defendants' view, pursuant to the MOU, Dominator purchased the right to move forward with development of residential units that would be deducted from the 589 total approved units held by the Defendants.

Dominator has a different understanding of what the "development rights" were and whether they were necessary. Based on communications with Boutet and the Town Planner, Pugliares believed that purchasing the development rights were a "threshold requirement to begin the approval process." (Pugliares Aff. ¶¶ 6, 10-13.) Pugliares claims that Boutet's representations were the only reason he signed the MOU and he would not

7

have signed the MOU unless he believed he needed the development rights. (Pl.'s S. Addt'l M.F. ¶ 15; Pugliares Aff. ¶ 18.) While one of Pugliares' October 6, 2011 emails suggested that he did not believe that he needed the development rights, but only sought them to "quicken" the process, he maintains took this position only "as a negotiating stance" because he believed he could obtain the rights for free or for a low price. (Def.'s S.M.F. ¶ 11; Pugliares Aff. ¶ 14.)

The MOU does not specifically define "development rights," but refers to them as "approved but unallocated unit sites." (Def. Mot. Summ. J. Ex. H.) This appears to refer to the original approval from 1989 for 589 residential unit sites. The MOU calls for Pine Ridge to transfer the rights to Dominator "to allow Dominator to apply to the Old Orchard Beach Planning Board" for developments planned for the Maintenance Area and another site. (Id.)

### 4. "Development rights" are ambiguous and disputed issues of material fact preclude summary judgment for any party.

Interpretation of an ambiguous document is a question of fact. *Champagne v. Victory Homes, Inc.*, 2006 ME 58, ¶ 8, 897 A.2d 803. "Document language is ambiguous if it is reasonably susceptible to different interpretations." *Id.* "[T]he intent of the parties in entering a contract is generally a question of fact." *Fitzgerald v. Hutchins*, 2009 ME 115, ¶ 16, 983 A.2d 382.

The MOU is not clear on its face. There are a number of disputed issues of material fact that preclude summary judgment for either party as to the enforceability of the MOU. While undisputed facts indicate that "development rights" exist in the abstract as the number of units permitted in each section under the DCCR, Def.'s S.M.F. ¶ 5, exactly what these rights encompass, whether they were necessary or helpful to

8

Dominator's development approvals from Dunegrass, the Town, and the DEP, and finally the intentions and understanding of the parties in entering into the MOU all must be determined by a factfinder. There is also an ambiguity in the MOU created by the language "in order to apply" that could either mean that the rights were understood to be required to apply to the Town or DEP (as Dominator claims), or that the rights were merely required under the DCCR (as the Defendants claim).[2] These ambiguities and conflicting understandings entitle neither party to judgment as a matter of law.

### C. The Ninth Hole

Defendants have also moved for summary judgment on Count III of their counterclaim. (Def.'s Mot. Summ. J. 17.) While Dominator concedes that 45 square feet of a sand trap on the Ninth Hole encroaches on the Defendants' property, Dominator denies this is interfering with the Defendants' ability to develop the property. (Pl.'s Opp. Def.'s S.M.F. ¶¶ 24-26; Libby Aff. ¶ 5.) Summary judgment is therefore denied.

### III. Conclusion

Disputed issues of material facts, particularly the nature of the "development rights" negotiated and memorialized by the parties in the MOU preclude summary judgment for either party on their respective claims. While Dominator concedes that part of a sand trap on the Ninth Hole encroaches into the Defendants' land, there are disputed issues of material fact as to whether this encroachment interferes with the Defendants' ability to develop the property and thus violates the terms of the purchase and sale agreement between the parties.

---

[2] It seems that Dominator believed the development rights were necessary to receiving public approvals from the Town and DEP, but the Defendants take the position that the rights are necessary to comply with the DCCR and overall private governance structure of Dunegrass. This creates an ambiguity that cannot be resolved against either party at the summary judgment stage.

9

The clerk shall make the following entry on the docket:

The Plaintiff's motion for summary judgment is hereby DENIED. The Defendants' motion for summary judgment is hereby DENIED.

SO ORDERED.

DATE: July 8, 2015

_____
John O'Neil, Jr.
Justice, Superior Court

10

CV-14-33

ATTORNEY FOR PLAINTIFF:
MATTHEW WARNER
PRETI FLAHERTY BELIVEAU PACHIOS LLP
PO BOX 9546
PORTLAND ME  04112


ATTORNEY FOR DEFENDANTS:
EDWARD MACCOLL
THOMPSON BULL FUREY BASS & MACCOLL
PO BOX 447
PORTLAND ME  04112-0447