STATE OF MAINE       ·                    SUPERIOR COURT
CUMBERLAND, ss.                            CIVIL ACTION

STATE OF MAINE
Cumberland, ss, Clerk's Office

MAY 18 2010

RECEIVED

DOCKET NO: CV-09-582

SAVINGS BANK OF MAINE
f/k/a GARDINER SAVINGS
INST., FSB

            Plaintiff,                      **ORDER**

      v.

EDGECOMB DEVELOPMENT, LLC,
BINTLIFF'S RESTAURANT CORP.,
& ROGER BINTLIFF,

            Defendants

This case began when the plaintiff, Savings Bank of Maine, brought this action to collect on a series of construction loans allegedly in default and to exercise its power of sale over certain mortgaged property. The plaintiff now asks the court to terminate the receivership over that mortgaged property and to discharge the receiver. The plaintiff has also filed a motion to dismiss the defendants' counterclaims. The defendants have filed a motion to amend their answer and counterclaims, and oppose the motion to dismiss.

## BACKGROUND

On August 30, 2005, defendant Edgecomb Development, LLC, obtained financing from plaintiff Savings Bank of Maine f/k/a Gardiner Savings Institute, FSB (the Bank) for a combined commercial and residential development project. The financing arrangement gave the Bank a mortgage and a security agreement with power of sale over the property being developed. Defendants Roger Bintliff, Edgecomb's owner, and Bintliff's Restaurant Corp. personally guaranteed the loan. Between September 30, 2005, and September 25, 2008, Edgecomb obtained

1

five additional loans with similar security arrangements for a total borrowed amount of $14,649,785.

The commitment letter for the initial loan conditioned the agreement on the following term, among others:

> Borrower/Guarantor agrees that upon sale of lots/units, and after principal reductions, 50% of net sale proceeds will be deposited at Bank for the express purpose of establishing a reserve account for future repayments and project management. The remaining 50% of net sale proceeds shall be disbursed to Borrower.

(M. Dismiss Ex. A at 5.)[1] None of the subsequent loans contained this provision. In contrast to the first loan's treatment of sales proceeds, the commitment letter for the third loan, dated January 17, 2007, demanded that:

> During the construction phase, interest will be due and payable monthly based on the daily principal balance. The Bank will receive 100% of the net sales proceeds to apply against Edgecomb Development loans. Any unpaid principal plus accrued interest will be due and payable at maturity.

(M. Dismiss Ex. C at 2.) Neither the letter nor the other loan documents specify precisely how the Bank would apply the sales proceeds to the loans. Other loans merely required monthly payments of interest with the entire amount due at maturity.

The defendants allege that the Bank's agents and officers promised that credit would be available as long as the defendants continued to sell the development's residential real estate lots. (Def.'s Countercl. ¶ 7.) The Bank monitored the development's progress on a monthly basis, and the Bank's president would personally evaluate the project approximately once every three

---

[1] The commitment letters are part of the contractual agreements from which the defendants' counterclaims arise and may be considered without converting this motion to dismiss into a motion for summary judgment. *Moody v. State Liquor & Lottery Comm'n*, 2004 ME 20, ¶ 11, 843 A.2d 43, 47.

months. (Def.'s Countercl. ¶ 8.) In August 2005, Bank agent Richard Alden went so far as to say that the Bank was partnering with Edgecomb Development on the project and would take control of sales revenues completely, manage payments, escrow for future payments as a paydown on principal, and reimburse the defendants for payments made to third-party contractors. (Def.'s Countercl. ¶ 9.) Mr. Alden also stated that the Bank was behind the project 100% and represented that the project had plenty of equity. (Def.'s Countercl. ¶ 10.)

The defendants claim that the project was successful and that the Bank participated in the sales of all completed property. (Def.'s Countercl. ¶¶ 13–14.) The Bank took all of the net proceeds of the sales. (Def.'s Countercl. ¶ 14.) From the start of the parties' relationship, the Bank would use these funds to reimburse the defendants for payments made to third-party contractors. (Def.'s Countercl. ¶ 15.) In 2006 the Bank's agents began making monthly inspections of the development to evaluate the work that had been done, discuss existing and prospective sales, and discuss the project's future. (Def.'s Countercl. ¶ 20.) At these meetings the Bank representatives assured the defendants that the Bank would continue to provide funding until the project was complete, and that requisitions would be paid as long as the completed properties continued to sell. (Def.'s Countercl. ¶ 21.)

In 2008 the Bank appointed Mr. Bintliff to its advisory board and gave him a check for $100,000. (Def.'s Countercl. ¶ 22.) In the Autumn of that year, the FDIC began to audit the Bank's finances and banking practices. (Def.'s Countercl. ¶ 24.) As the Bank was coming under scrutiny, its loan officer Katie Vickers told the defendants that their credit limit for new loans had increased. (Def.'s Countercl. ¶ 25.) It was at this time that the Bank stopped paying the defendants'

3

requisitions, though it continued to take 100% of the project's net proceeds. (Def.'s Countercl. ¶ 26.) The Bank assured the defendants that payment of the requisitions would recommence in the near future. (Def.'s Countercl. ¶ 26.)

Between the Autumn of 2008 and the Summer of 2009, the defendants incurred between $700,000 and $800,000 in construction costs which they submitted to the Bank. (Def.'s Countercl. ¶ 25.) The Bank told the defendants that it was unable to cover the requisitions due to the presence of the FDIC auditors, but would do so in the near future. (Def.'s Countercl. ¶ 27.) Sales totaling approximately $1,700,000 were made during this period. (Def.'s Countercl. ¶¶ 28–29.) The defendants did not seek to secure alternative sources of financing at any time. (Def.'s Countercl. ¶ 17.)

In April 2009, the Bank's president, Arthur Marcos, participated in the monthly site-inspection and told the defendants: "We're behind you 100%. I like this project." (Def.'s Countercl. ¶ 30.) Two weeks later on May 1, 2009, the Bank declared the defendants in default. (Def.'s Countercl. ¶ 31.) Prior to the declaration of default, the Bank had managed payment of the defendants' loans and made the payments internally from sales' proceeds. (Def.'s Countercl. ¶ 36.) The defendants claim that the Bank did not give them notice that this procedure was changing and that the defendants would be responsible for making those payments. (Def.'s Countercl. ¶¶ 37–38.) In August 2009, the Bank received an Order to Cease and Desist from the Office of Thrift Supervision. (Def.'s Countercl. ¶ 32.)

On October 28, 2009, the Bank filed an action to collect on the loans and exercise its power of sale over the property. A receiver was appointed on an emergency basis, and the property was sold for $7,500,000 at auction on January

4

29, 2010. The Bank was the only bidder. On February 16, 2010, both parties were given leave to amend their pleadings. On March 4, 2010, the Bank filed these motions to dismiss the defendants' counterclaims and to terminate the receivership. The defendants oppose the motion to dismiss and have filed a motion to amend their answer.

## DISCUSSION

The Bank's unopposed motion to terminate the receivership and discharge the receiver is granted as the property has been sold at auction. The defendants' motion to amend their answer pursuant to Rule 15 is granted as well. Rule 15(a) calls for courts to freely give leave to amend "when justice so requires," M.R. Civ. ¶. 15(a), particularly when the amendment is necessary to cure a defective pleading. *See Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell*, 1998 ME 70, ¶ 10, 708 A.2d 283, 286–87 (citing *Barkley v. Good Will Home Ass'n*, 495 A.2d 1238 (Me. 1985)). The defendants seek to add a counterclaim for fraud to their answer with the facts necessary to meet Rule 9(b)'s heightened pleading standard. This litigation is still in the early stages of discovery and the Bank will not be prejudiced by the amendment.

The defendants have lodged eight counterclaims against the Bank: Breach of Oral Contract; Breach of the UCC's Duty of Good Faith and Fair Dealing; Breach of Fiduciary Duty; Negligent Misrepresentation; Negligence; Promissory Estoppel; Unjust Enrichment; and Fraud or Fraudulent Misrepresentation.

On a motion to dismiss, the court examines "the complaint in the light most favorable to the [counterclaim] plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the [counterclaim] plaintiff to relief pursuant to some legal theory." *Moody v. State Liquor & Lottery*

5

*Comm'n*, 2004 ME 20, ¶ 7, 843 A.2d 43, 46 (quoting *In re Wage Payment Litig.*, 2000 ME 162, ¶ 3, 759 A.2d 217, 220). The complaint's material allegations "must be taken as admitted," and "dismissal should only occur when it appears beyond a doubt that a plaintiff is entitled to no relief under any set of facts that he might prove in support of his claims." *Moody v. State Liquor & Lottery Comm'n*, 2004 ME 20, ¶ 7, 843 A.2d 43, 47 (quoting *Livonia v. Town of Rome*, 1998 ME 39, ¶ 5, 707 A.2d 83, 85; *McAfee v. Cole*, 637 A.2d 463, 465 (Me. 1994)) (internal quotations omitted).

## 1. Breach of Oral Contract

The Bank contends that the applicable statute of frauds, 10 M.R.S.A. § 1146, and the parol evidence rule preclude consideration of extrinsic evidence relating to the parties' contractual relationships. The defendants counter that the statue of frauds has been met and that extrinsic evidence of unwritten contractual terms or conditions may be admissible. If proven, the defendants argue that this extrinsic evidence will show that the Bank breached its contract.

The statute of frauds requires that "any agreement to lend money, extend credit, forbear from collection of a debt or make any other accommodation for the repayment of a debt for more than $ 250,000" be evidenced by a writing signed by the party to be charged. 10 M.R.S.A. § 1146 (2009). The statute is waived, however, when the "person to be charged with the promise, contract or agreement fail[s] to notify the borrower that the promise, contract or agreement must be in writing for an action to be maintained." § 1146(2). Almost any writing or series of writings can suffice to prove that the parties did in fact have a contractual relationship. *Brown Dev. Corp. v. Hemond*, 2008 ME 146, ¶ 12, 956 A.2d

104, 108 (citing *Wells Fargo Home Mortgage, Inc. v. Spaulding*, 2007 ME 116, ¶ 20, 930 A.2d 1025, 1030).

Each development loan was governed by multiple signed writings. These writings satisfy the statute of frauds as applied to each loan agreement. While the defendants do not claim that the Bank breached the written terms of these contracts, they do argue that the Bank breached certain oral conditions and provisions appended to the writings. When the statute of frauds has been satisfied, the court may consider extrinsic evidence to resolve an ambiguity in the writing. *Villas by the Sea Owners Ass'n v. Garrity*, 2000 ME 48, ¶ 10, 748 A.2d 457, 461. The court may also consider parol or other extrinsic evidence varying or adding to the writing if the agreement is not fully integrated. *Brown Dev. Corp.*, 2008 ME 146, ¶¶ 12–13, 956 A.2d at 108.

These exceptions to the general exclusion of "extrinsic evidence offered to vary, add to, or contradict the terms of an integrated written agreement" could apply here. *Id.* ¶ 13, 956 A.2d at 108. Drawing all reasonable inferences in the defendants' favor, it is entirely possible that the written contracts could be ambiguous or unintegrated. For example, the written provision requiring the Bank to apply sales' proceeds to the defendants' loans does not specify whether the proceeds would be applied over time or in one lump sum. (*See* M. Dismiss Ex. A at 5, C at 2.) Without deciding that it is so, this could be an incomplete or ambiguous provision. In this gap, the defendants' allegations that the parties had orally agreed for the Bank to apply these sums to the defendants' monthly payments, but failed to do so, could show that the Bank did breach an oral provision of the contract.

7

Alternatively, the defendants contend that the parties had an unwritten contract by which the Bank was bound to continue extending credit so long as the defendants continued to develop and sell property. If all of the defendants' allegations are true, the Bank's words and conduct could have given rise to a unilateral contract on which the defendants had begun to perform. *See Taliento v. Portland W. Neighborhood Planning Council*, 1997 ME 194, ¶ 17 n.2, 705 A.2d 696, 701 n.2 (Lipez, J., dissenting) (citing 1 Arthur L. Corbin et al., Corbin on Contracts § 1.23, at 89 (rev. ed. 1993)) (explaining the elements of a unilateral contract). The statute of frauds would not necessarily preclude such a contract in this case because the Bank allegedly failed to give notice that it would be unenforceable if not in writing. *See* 10 M.R.S.A. § 1146(2); *S.S. Navigation Co. v. Camden Nat'l Bank*, 2006 ME 11, ¶ 7, 889 A.2d 1014, 1017 (section 1146 notice given for one loan does not provide adequate statutory notice for other loan agreements between the same parties).

Because the defendants' pleading shows that they might be able to recover for breach of contract under some legal theory, Count I of their counterclaim survives.

## 2.    Breach of the UCC's Duty of Good Faith and Fair Dealing

While a creditor-debtor relationship does not itself impose a fiduciary duty on either party, the Uniform Commercial Code does impose a duty of good faith and fair dealing on lending banks. *First NH Banks Granite State v. Scarborough*, 615 A.2d 248, 250 (Me. 1992) (citing 11 M.R.S.A. § 1-203 (1964)). "Good faith" requires "honesty in fact in the conduct or transaction concerned." 11 M.R.S.A. § 1-201(19) (2009).

8

Accepting that the defendants may be able to prove the Bank breached the parties' contract, the defendants allege that this breach was intentional and malicious. The defendants claim that between 2008 and 2009 the Bank knew it could no longer extend credit or reimburse the defendants' construction expenses, but falsely assured the defendants that it would continue to do both. These false assurances induced the defendants to make additional expenditures improving the value of the property shortly before foreclosure. This, if true, could constitute a breach of the implied duty of good faith as well as a breach of the alleged contract.

However, the law does not create a separate cause of action for breach of the UCC's implied duties. U.C.C. § 1-304 cmt. 1 (2004) (enacted as 11 M.R.S.A. § 1-203 (2009)). "[T]he doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached." *Id.* While the UCC's implied duties may guide the court's interpretation of the contracts and affect the remedies available to a party in the event of breach, it does not support a separate claim independent of that for breach. *Id.* The defendants' Count II is dismissed accordingly.

### 3. Breach of Fiduciary Duty

The creditor-debtor relationship generally does not impose fiduciary duties on either party. *First NH Banks Granite State*, 615 A.2d at 250; *see Camden Nat'l Bank v. Crest Constr., Inc.*, 2008 ME 113, ¶ 11, 952 A.2d 213, 216 (same for mortgagee-mortgagor relationship). Absent a status or agreement that imposes a fiduciary relationship, such duties may still exist where one party actually places

9

trust and confidence in the other and "a great disparity of position and influence" exists between the parties. *Camden Nat'l Bank*, 2008 ME 113, ¶ 13, 952 A.2d at 217 (quoting *Ruebsamen v. Maddocks*, 340 A.2d 31, 35 (Me. 1975)) (internal quotations omitted); *see Morris v. Resolution Trust Corp.*, 622 A.2d 708, 712 (Me. 1993).

While the parties in this case trusted each other to faithfully perform their contractual duties, the defendants have not alleged facts that, if proven, could create a fiduciary relationship. First, the defendants have not shown any "great disparity of position and influence" between themselves and the Bank. All parties were sophisticated business entities. While the defendants' correctly point out that the Bank was in a better position to know whether it could make good on its promises, this advantage is common to most parties in most contracts. Similarly, the only trust the defendants allege to have placed in the Bank was the trust that it would honor the contracts. Finding fiduciary duties under these circumstances would essentially impose fiduciary duties between all contractually bound creditors and debtors. The court will not do this. Count III of the defendants' counterclaim is dismissed.

### 4. Negligent Misrepresentation & Promissory Estoppel

The defendants claim that the Bank negligently misrepresented its ability and willingness to continue financing the project, and that they reasonably relied on these misrepresentations to their detriment. Alternatively, the defendants argue that their reasonable reliance on the Bank's statements was foreseeable and they should thus be allowed to recover under the theory of promissory estoppel.

10

Maine has adopted the Restatement (Second) of Torts' standard for negligent misrepresentation. *Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 13, 832 A.2d 771, 774. Section 552(a)(1) of the Restatement states:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Id.* (quoting Restatement (Second) of Torts § 552(a)(1) (1977)) (emphasis removed). Maine has also adopted the Restatement (Second) of Contracts' definition of promissory estoppel as:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Harvey v. Dow*, 2008 ME 192, ¶ 11, 962 A.2d 322, 325 (quoting Restatement (Second) of Contracts § 90(1) (1981)).

The defendants argue that the Bank expressly told them that it would continue to finance the project so long as completed properties continued to sell, even though the Bank should have known that this was not true. The Bank's statement allegedly induced the defendants to enter the now-disputed contracts, by which the defendants have been harmed. The only harm alleged under Counts IV and VI is that the contracts entitle the Bank to take 100% of the net sales proceeds from the project and apply those funds to the defendants' loans. The defendants claim that they would not have agreed to this term if they had known that the Bank would not be able to finance the project through its completion.

11

The defendants' negligent misrepresentation claim must fail for the simple reason that the Bank's alleged statement was not a representation of fact. It was, instead, an expression of the Bank's intended future action, or a promise to take certain actions in the future. On the surface this may appear to support the defendants' claim of promissory estoppel, but that too must fail. The defendants claim that they were harmed by unfavorable contract terms they agreed to in reliance upon the Bank's promise of future financing. Stated a different way, the defendants argue that they understood the Bank's promise to be a part of the parties' bargain despite the fact that it was not included in the written agreement. This is the issue of contract interpretation raised in the defendants' Count I. The defendants have failed to plead independent prima facie claims for negligent misrepresentation and promissory estoppel, and both Counts IV and VI are dismissed.

5.    **Negligence**

The defendants' Count V asserts negligence on the same alleged facts underlying their claim for negligent misrepresentation. They claim that the parties' business relationship obligated the Bank to exercise reasonable care to prevent pecuniary loss to the defendants. Neither a creditor-debtor nor a mortgagee-mortgagor relationship imposes a duty of care between the parties. *Camden Nat'l Bank*, 2008 ME 113, ¶ 11, 952 A.2d 213, 216 (citing *Morris*, 622 A.2d at 712). The defendants have not pleaded any facts that would create an extra-contractual duty between the parties and their claim for negligence is dismissed.

6.    **Unjust Enrichment**

Count VII of the defendants' counterclaim alleges that the Bank retained a benefit from the loan transactions at the defendants' expense, and that this makes

12

the Bank's failure to extend credit inequitable. The doctrine of "unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay." *Top of the Track Assocs. v. Lewiston Raceways*, 654 A.2d 1293, 1296 (Me. 1995) (quoting *A.F.A.B., Inc. v. Town of Old Orchard Beach*, 639 A.2d 103, 105 n.3 (Me. 1994)) (internal quotations omitted). Here the loan transactions were clearly governed by a contract. While the contours of that contract may be in dispute, its unchallenged existence precludes the defendants from recovering under the theory of unjust enrichment in connection with the loans. The defendants' Count VII is dismissed.

## 7.    Fraud

Count VIII alleges fraud. Fraud must be proven by clear and convincing evidence. *Rand*, 2003 ME 122, ¶ 9, 832 A.2d at 773. The defendants must show:

> (1) that the [Bank] made a false representation, (2) of a material fact, (3) with knowledge of its falsity or in reckless disregard of whether it is true or false, (4) for the purpose of inducing the [defendants] to act in reliance upon it, and, (5) the [defendants] justifiably relied upon the representation as true and acted upon it to the [defendants'] damage.

*Id.*

The defendants claim that in the Autumn of 2008 the Bank knew it was under investigation by the FDIC, was in a precarious financial situation, and would probably not be able to continue extending credit. (Def.'s Countercl. ¶¶ 84–85.) Nonetheless, at this time Bank representative Richard Alden told the defendants that the Bank was behind the project and would continue to extend new loans as long as finished properties continued to sell. (Def.'s Countercl. ¶ 87.) Furthermore, Bank loan officer Katie Vickers told the defendants that their credit limit had been increased due to the Bank's recent acquisition of other

13

financial institutions. (Def.'s Countercl. ¶ 25.) In April 2009, Bank president Arthur Marcos made similar statements expressing his and the Bank's absolute financial support for the defendants' enterprise. (Def.'s Countercl. ¶ 88.)

While the Bank's representatives were making these statements, the Bank had stopped reimbursing the defendants for construction costs. It had been the parties' practice for the Bank to disburse funds covering such costs from the sales' proceeds under its control. (Def.'s Countercl. ¶¶ 27–28.) When asked about the change, the Bank promised that the disbursements would resume in the near future and encouraged the defendants to continue expending their own funds on developing the project. (Def.'s Countercl. ¶¶ 27–28.) Relying on the Bank's expressions of financial assurance, the defendants did expend an additional $700,000 to $800,000 of their own funds on project improvements. (Def.'s Countercl. ¶ 94.) The Bank stopped making internal payments to service the defendants' loans and foreclosed shortly thereafter. (Def.'s Countercl. ¶¶ 30–31.)

The defendants allege that the Bank, knowing it was in financial trouble and intending to foreclose on the project, purposefully misrepresented its willingness and ability to pay the defendants' expenses and extend new financing. (Def.'s Countercl. ¶ 93.) The Bank's purpose was to induce the defendants to invest their own money on improving the total value of the project before the Bank took it through foreclosure. (Def.'s Countercl. ¶ 93.) The misstatements also prevented the defendants from finding alternative sources of funding that would have allowed them to refinance their debt and avoid foreclosure. (Def.'s Countercl. ¶ 95.)

The defendants have alleged a colorable claim for fraud with requisite specificity. If the defendants are able to prove their allegations, the Bank's actions

14

could be found to constitute fraud. It misrepresented facts about its own financial position in order to obtain an economic advantage by deceiving the defendants. The Bank's ability and willingness to provide future funding was material to the defendants' conduct of their own business, and the defendants' reliance on the Bank's representations about its own economic position could have been reasonable. At this early stage of the litigation, the court cannot say the claim is barred as a matter of law and the defendants' Count VIII survives.

## The entry is:

The Bank's motion to terminate receivership is granted, as is the defendants' motion to amend their answer. The Bank's motion to dismiss the defendants' counterclaims is granted on Counts II through VII for breach of the UCC's duty of good faith and fair dealing, breach of fiduciary duty, negligent misrepresentation, negligence, promissory estoppel, and unjust enrichment. The motion to dismiss is denied on Counts I and VIII, breach of contract and fraud.

DATE: _May 18, 2010_

_____
Roland A. Cole
Justice, Superior Court

15

SAVINGS BANK OF MAINE VS EDGECOMB DEVELOPMENT LLC ET ALS
UTN:AOCSsr  -2009-0118939                    CASE #:PORSC-CV-2009-00582
----------------------------------------------------------------------

01 0000007826        COLLINS, NATHAN
   30 MILK STREET PO BOX 449 PORTLAND ME 04112-0449

| | | | | |
|---|---|---|---|---|
| F | EDGECOMB DEVELOPMENT LLC | DEF | RTND | 12/14/2009 |
| F | BINTLIFFS RESTAURANT CORPORATION | DEF | RTND | 12/14/2009 |
| F | ROGER BINTLIFF | DEF | RTND | 12/14/2009 |

02 0000003304        MANHEIMER, JACOB
   ONE MONUMENT SQUARE PORTLAND ME 04101

| | | | | |
|---|---|---|---|---|
| F | SAVINGS BANK OF MAINE | PL | RTND | 10/28/2009 |